FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA FEB 27  PM 3: 50
ORLANDO DIVISION

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO. FLORIDA

ENVIRONMENTAL MANUFACTURING : 
SOLUTIONS, LLC, :     CASE NO.: 609-cv-595-orl-28DAB
:
    Plaintiff, :
:
v. :
:
PEACH STATE LABS, INC., :
:
    Defendant. :

## COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT NON-INFRINGEMENT AND PATENT INVALIDITY

Plaintiff, ENVIRONMENTAL MANUFACTURING SOLUTIONS, L.L.C. ("EMS"), upon knowledge with respect to itself, and upon information and belief with respect to all other matters, hereby files this Complaint for Declaratory Judgment of Patent Non-Infringement and Invalidity, and Demand for Jury Trial, with regard to the U.S. Patent No.: 5,672,279 (the "279 Patent"), against the Defendant, PEACH STATE LABS, INC., ("Peach State"), and states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff, EMS, is a Florida limited liability corporation with its principal offices at 7705 Progress Circle, Melbourne, Florida 32904-1657.

2.    Defendant, Peach State, is a Georgia corporation with its principal place of business at 180 Burlington Drive, Rome, Georgia 30161.

0292012/137709/1213579/4

1

3. Defendant Peach State is subject to the personal jurisdiction of this Court, and venue is proper in this District pursuant to 28 U.S.C. § 1391(c), which makes a corporate defendant subject to suit in any District where it is subject to personal jurisdiction. Peach State regularly engages in the transaction of business throughout the State of Florida, including within this judicial district and division. Peach State is subject to personal jurisdiction under the Florida Long Arm Statute, including, *inter alia*, Fla. Stat. § 48.193(1)(a), § 48.193(1)(b), § 48.193(f), and § 48.193(2). The exercise of personal jurisdiction in this case is consistent with due process because Peach State has significant distribution channels and contacts with the State of Florida. The Middle District of Florida, Orlando Division, is also where a substantial part of the actions giving rise to this lawsuit took place.

4. This is an action for declaratory judgment and non-infringement of Defendant, Peach State's 279 Patent, a copy of which is attached hereto as Exhibit "A." This action arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, 2202, and under the patent laws of the United States, Title 35 United States Code. This Court has subject matter jurisdiction under 28 U.S.C. § 1338.

5. This Court also has diversity jurisdiction under 28 U.S.C. § 1332. There is complete diversity of citizenship between Plaintiff EMS and Defendant Peach State. The amount in controversy exceeds $75,000.00, exclusive of interest and costs. Venue in this action is proper in this District under 28 U.S.C. § 1391.

6.     On November 26, 2008, Peach State brought its own Complaint for Patent Infringement on the 279 Patent against EMS in a case styled, *Peach State Labs, Inc., Plaintiff, vs. Environmental Manufacturing Solutions, LLC, Defendant, United States District Court for the Northern District of Georgia, Rome Division, Case No.: 4:08-cv-190-HLM* (the "Peach State Georgia Infringement Action"). EMS is challenging personal jurisdiction in the Peach State Georgia Infringement Action, a FRCP Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction being timely filed on March 2, 2009.  These two actions involve overlapping issues and parties, but the compelling circumstance that warrants an exception to the first-filed rule is that EMS is not subject to personal jurisdiction in Georgia.  EMS does not do business in the State of Georgia; EMS does not receive any revenue from sales of products in the State of Georgia; EMS does not have any employees, agents or distributors in the State of Georgia; EMS does not solicit business in the State of Florida; EMS neither owns, uses or possesses any property within the State of Georgia; and EMS has not sold any products, including those alleged to infringe on the 279 Patent, to any customers in Georgia.   This lack of Georgia jurisdiction over EMS issue will be decided in the Peach State Georgia Infringement Action.

## BACKGROUND

7.     In 2006 or 2007, a salesman representing Defendant Peach State called on Plaintiff EMS at EMS' offices in Melbourne, Florida, to see if EMS was

interested in purchasing products from Peach State.  Subsequently, EMS placed orders with Peach State that were mailed, telecopied, or sent via email, from EMS' offices in Florida to the Peach State headquarters in Rome, Georgia.   No contractual negotiations between EMS and Peach State ever took place in Georgia; rather, all orders were based on the presentation made in EMS' offices in Florida by Peach State. EMS stopped doing business with Peach State after June 2008.

8.     For many years, EMS has developed and marketed environmentally friendly products which serve as effective replacements for harsh and dangerous acids, solvents and caustics, so prevalent in the world of industrial cleaners.  The EMS products being marketed and sold in Florida include, *inter alia*, *EMS Ready-Mix Truck Wash and Wax* ("EMS Ready-Mix"), as well as a *SynTech Ph* product line, and a *BlowOut* product line.  The only EMS accused product line that has any bearing whatsoever on the instant lawsuit is EMS Ready-Mix, as EMS Ready-Mix is the only one of these products that contains *urea hydrochloride* (although Peach State wrongly suggests otherwise in the Peach State Georgia Infringement Action).

9.     Declaratory judgment subject matter jurisdiction exists under the patent laws of the United States because Defendant Peach State has leveled, and continues to level against EMS, baseless accusations that the making, selling, offering for sale and/or promoting and actively marketing products containing urea

hydrochloride by EMS, including the accused product lines of *EMS Ready-Mix*, *SynTech Ph* and/or *BlowOut*, infringes on Peach State's 279 Patent.

10.   A dispute that is definite and concrete, touching the legal relations of parties having adverse legal interest that is real and substantial under all of the circumstances does in fact exist between Plaintiff EMS and Defendant Peach State with regard to these EMS accused products and the Peach State 279 Patent, as shown by Peach's State's bringing of Peach State Georgia Infringement Action against EMS. Peach State has also distributed information through the Internet, and by other channels of communication, that charges EMS with patent infringement. By also actually suing EMS for patent infringement in the Peach State Georgia Infringement Action, Peach State has definitely established the existence of an actual and continuing justiciable controversy between EMS and Peach State with respect to the alleged infringement of Peach State's 279 Patent.  Peach State also made pre-suit demand upon EMS to cease and desist such alleged infringement. Peach State has purposely directed its activities at residents of Florida such as EMS, and the compelling circumstance that warrants an exception to the first-filed rule is that EMS is not subject to personal jurisdiction in Georgia.

11.   The issued claims in the 279 Patent read as follows:

1.   A method to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes adding to the suspensions or dispersions a sufficient amount of urea hydrochloride to convert the calcium carbonate to a water soluble salt,

wherein a molar ratio of urea to hydrochloric acid approximately between 1:4 and 4:1 is used to form said urea hydrochloride.

2.     The method of claim 1, wherein the calcium carbonate is in paper manufacturing process water.

3.     The method of claim 1, wherein said ratio of urea to hydrochloric acid is approximately 2:1.

4.     The method of claim 1, wherein said ratio of urea to hydrochloric acid is approximately 1:1.

5.     The method of claim 1, wherein the calcium carbonate is in paper recycling process water.

The 279 Patent discloses two methods for using urea hydrochloride: "a method to remove the build-up of water-insoluble metal salts on surfaces, and a method to lower the solids content of industrial liquids that contain water-insoluble metal salts". [col. 3, lines 9-12]   The latter embodiment is also described as the "dissolution of water-insoluble metal salt dispersions or suspensions."  Throughout the Specification of the 279 Patent, these uses are described as being distinct.

12.     The claims within the 279 Patent cannot be construed to cover the use of urea hydrochloride as a surface cleaning agent, which comports with the opinion of the Patent Examiner responsible for the 279 Patent, on grounds of prior art.  To the extent the 279 Patent is construed to encompass the disclosed  surface-cleaning embodiment, then the 279 Patent is invalid under 35 U.S.C. § 102 and/or § 103.

13.    Further, the claims within the 279 Patent as issued and interpreted to encompass the solubilization of calcium carbonate in aqueous suspensions or dispersions, are invalid under 35 U.S.C. § 102 and/or § 103.

14.    Claim 1 of 279 Patent Claim 1 as filed reads "[a] method to remove undesirable solids comprising a water-insoluble metal salt that includes treating the solids with a sufficient amount of urea hydrochloride to convert the water insoluble salt to a water soluble salt". The file wrapper for the 279 Patent reveals that during prosecution, in order to secure allowance, it was argued by Peach State that:

> The claimed invention is a method of solubilizing calcium carbonate in aqueous suspensions or dispersions of calcium carbonate. . . . Applicants have amended the claims to more clearly define the types of undesirable solids that are removed (calcium carbonate), . . . and what the solids are removed from (aqueous suspensions or dispersions of the calcium salts).

Thus, although the 279 Patent teaches the use of urea hydrochloride to remove concrete from surfaces, the claim language as issued does not cover such a composition and method of use. Peach State is barred from contending otherwise by prosecution history estoppel, as well as a "disclosed but not claimed" situation.

15.    EMS is neither using the method described in the 279 Patent, nor promoting or providing products for use of that method by others, so EMS is not engaged in direct infringement, nor is EMS inducing others to infringe. The raw material components in the entire EMS product line are staple commodities of commerce suitable for  non-infringing use, and EMS is not engaged in direct infringement nor does it contribute to infringement by the selling of these products.

16.     EMS is not infringing the 279 Patent.

17.     All conditions precedent to the bringing of this action have occurred or been waived.

## DECLARATORY JUDGMENT FOR PATENT NON-INFRINGEMENT AND INVALIDITY

18.     Paragraphs 1 through 17 are incorporated by reference herein.

19.     Peach State has accused EMS of willful patent infringement, with regard to the 279 Patent, by bringing the Peach State Georgia Infringement Action.

20.     Plaintiff EMS is not infringing, or inducing others to infringe, Defendant Peach State's 279 Patent, with regard to the accused products or otherwise, and EMS requests a declaration from the Court so finding.

21.     EMS affirmatively states that certain, if not all, of the claims of the 279 Patent are invalid for failure to satisfy the conditions and requirements for patentability as set forth in Title 35, United States Code Sections 102 and 103, and EMS requests a declaration of the Court so finding.

22.     On information and belief, the 279 Patent also failed to satisfy other conditions and requirements for patentability, the evaluation of which is ongoing.

23.     Faced with the prospect of being sued in an inconvenient forum which does not have personal jurisdiction over EMS (the Peach State Georgia Infringement Action), EMS prays that this Court enter a declaratory judgment.

WHEREFORE, Plaintiff, EMS, respectfully prays that this Court enter a judgment under 28 U.S.C. § 2201, declaring that EMS has not infringed, or induced others to infringe, Defendant Peach State's 279 Patent; that Defendant Peach State's 279 Patent is invalid; for an injunction prohibiting Defendant, Peach State, its officers, agents, servants, employees and other representatives, and all persons in active concert or participation with any of them, from charging infringement of, or instituting any action for alleged infringement of, the 279 Patent, against EMS; for reasonable attorney's fees and costs of suit; and for such other and further relief as this Court deems just, equitable and proper.

Respectfully submitted, this 27th day of February, 2009.

THOMAS TODD PITTENGER
Florida Bar No. 768936
todd.pittenger@lowndes-law.com
Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
450 South Orange Avenue, Suite 250
Post Office Box 2809
Orlando, Florida 32802
Telephone:  (407) 843-4600
Facsimile:  (407) 843-4444

*Counsel for Plaintiff, EMS*

0292012 137709 1213579 1

9

# EXHIBIT "A"

US005672279A

## United States Patent [19]

Sargent et al.

[11] **Patent Number:** 5,672,279

[45] **Date of Patent:** Sep. 30, 1997

[54] **METHOD FOR USING UREA HYDROCHLORIDE**

[75] Inventors: **R. Richard Sargent**. Rome; **Jeffrey Randolph Alender**. Marietta; **Thomas Hudson Moss, III**. Rome, all of Ga.

[73] Assignee: **Peach State Labs, Inc.**. Rome. Ga.

[21] Appl. No.: **233,348**

[22] Filed: **Apr. 25, 1994**

### Related U.S. Application Data

[60] Continuation-in-part of Ser. No. 90,797, Jul. 12, 1993, abandoned, which is a division of Ser. No. 919,523, Jul. 24, 1992, Pat. No. 5,234,466.

[51] Int. Cl.[6] ............................................ C02F 5/12

[52] U.S. Cl. ............... 210/698; 134/3; 134/22.14; 134/22.19; 162/45; 162/48; 252/180; 210/701; 510/240; 510/245

[58] Field of Search ...................... 134/3, 22.11, 19, 134/22.14, 22.19; 210/698–701; 162/45, 48; 252/87, 142, 148, 180, 181, 82

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,936,316 | 2/1976 | Gulla | 134/3 |
| 3,953,352 | 4/1976 | Mizutani et al. | 252/142 |
| 4,164,477 | 8/1979 | Whitely | 252/99 |
| 4,285,738 | 8/1981 | Ogata | 428/270 |
| 4,448,841 | 5/1984 | Glass et al. | 166/307 |
| 4,466,893 | 8/1984 | Dill | 252/148 |
| 4,673,522 | 6/1987 | Young | 210/702 |
| 4,756,888 | 7/1988 | Gallup et al. | 210/696 |
| 4,830,766 | 5/1989 | Gallup et al. | 427/98 |
| 4,882,202 | 11/1989 | Holtzan et al. | 210/698 |
| 4,894,169 | 1/1990 | Delitsky | 8/585 |
| 5,234,466 | 8/1993 | Sargent et al. | 8/585 |
| 5,308,401 | 5/1994 | Geke et al. | 134/2 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 37811 | 2/1986 | Hungary . |
| WO 94/02549 | 2/1994 | WIPO . |

*Primary Examiner—Peter A. Hruskoci*
*Attorney, Agent, or Firm—Kilpatrick & Cody*

[57] **ABSTRACT**

A method to remove the build-up of water-insoluble metal salts on surfaces, and a method to lower the solids content of industrial liquids that contain water-insoluble metal salts using urea hydrochloride or its equivalent. Also disclosed is a method to use urea hydrochloride or an equivalent strong acid/weak base salt as acid replacements for a variety of purposes.

**5 Claims, No Drawings**

5,672,279

1

## METHOD FOR USING UREA HYDROCHLORIDE

This application is a continuation-in-part of and claims priority to U.S. Ser. No. 08/090,797, filed on Jul. 12, 1993 now abandoned, which is a divisional of, and claims priority to U.S. Ser. No. 07/919,523, filed on Jul. 24, 1992, entitled "Lowering the pH of Textile Processing Solution by Adding Urea Sulfate as a pH Adjusting Agent," by R. Richard Sargent and Jeffrey R. Alender, now U.S. Pat. No. 5,234,466.

This application describes methods for the use of urea hydrochloride.

### BACKGROUND OF THE INVENTION

Calcium carbonate is often used or produced in industrial processes. Calcium carbonate is used, for example, as a source of lime, a neutralizing agent, a filler or extender in rubber, paints, and plastics, in the fortification of bread, putty, tooth powders, antacid, and whitewash. It is also used in portland cement and metallurgical flux. Calcium carbonate is alternatively referred to as chalk, calcite, marble, limestone, and whiting. One major use of calcium carbonate is as an opacifying agent in paper production and recycling.

A disadvantage of using calcium carbonate is that it is only very slightly soluble in water, and thus tends to build up as a deposit on surfaces, or form a dispersion in water-based liquids. These residues and dispersions can be a nuisance or, more importantly, can adversely affect industrial processes or equipment. For example, $CaCO_3$ used in paper manufacture and recycling enters the effluent of the plant as a suspended solid that raises the pH of the water and causes the water to appear chalky. This effluent cannot be disposed of in publicly owned treatment facilities because of its solids content and pH. In a typical process, hydrochloric acid is added to the water to dissolve the calcium carbonate, removing the dispersion, and then the pH is adjusted to approximately neutral with base. However, hydrochloric acid is a gas that can corrode equipment and is noxious to humans.

Calcium carbonate is also a major cause of boiler scale when hard water is used in heating systems. It is sometimes difficult to remove the calcium carbonate boiler residue in a manner that does not adversely affect the equipment.

U.S. Pat. No. 4,830,766 discloses a method for treating an aqueous geothermal fluid that contains dissolved ferric cations and silicous material that tend to interact to form insoluble iron silicates, that includes adding a variety of reducing agents, including urea, urea hydrochloride, formamide, formamide hydrochloride, oxalic acid, and ascorbic acid.

Hungarian Patent No. 37,811 (Chem Abstr. 105:117062z 1986) discloses a composition for the removal of scale that includes hydrochloric acid (3–10%), urea or thiourea (0.2–1.0%), hexamethylenetetramine (0.2–1.5%) and water.

It is an object of the present invention to provide a method to remove the build-up of water-insoluble metal salts on surfaces.

It is another object of the present invention to provide a method to lower the solids content of industrial liquids that contain water-insoluble metal salts.

It is another object of the present invention to provide a method for the treatment of effluent from paper manufacturing and recycling processes.

It is another object of this invention to provide a method for the removal of water-insoluble salt residue from masonry.

2

### SUMMARY OF THE INVENTION

It has been discovered that urea hydrochloride is an inexpensive and useful agent for the removal of the build-up of water-insoluble metal salts on surfaces, and the dissolution of water-insoluble metal salt dispersions or suspensions. Urea hydrochloride is also useful in the neutralization of alkaline processing or waste streams, including those generated from paper manufacturing and recycling. Urea hydrochloride is especially useful in the removal or dissolution of calcium carbonate.

Urea hydrochloride can be formed with any desired ratio of urea and hydrochloric acid that performs the desired function. Examples of suitable salts include those formed by combining between 1:4 and 4:1 moles of urea with hydrochloric acid, more usually between 2.5 and 0.25 or 0.5 moles of urea with one mole of hydrochloric acid. A preferred composition contains at least approximately 1 mole of urea to one mole of hydrochloric acid, for example, a ratio of between approximately 1 and 2 moles of hydrochloric acid.

The use of urea hydrochloride to remove the build-up of water-insoluble metal salts on surfaces, and to dissolve water-insoluble metal salt dispersions or suspensions, has advantages over conventional methods using hydrochloric acid or other agents. For example, urea hydrochloride is less corrosive to metal equipment and other contact surfaces than the equivalent amount of hydrochloric acid, and has a significantly less tendency to release hydrogen chloride gas. Urea hydrochloride or its equivalent has the same or similar ability to dissolve insoluble salts or perform other functions as the equivalent amount of uncomplexed HCl, based on the total weight of HCl in the composition.

In a preferred embodiment, urea is the only base used in combination with hydrochloric acid in the composition. In an alternative embodiment, the salt of any strong acid with urea or other weak base can be used in place of urea hydrochloride if, when combined with a water insoluble metal salt, it produces a water soluble metal salt. Examples include mixtures of strong acids with, for example, alkanolamines, including triethanolamine, diethanolamine, monoethanolamine and $HO—[(alkyl)O]_x—CH_2)_yNH_2$, including $HO—[(CH_2)_xO]—CH_2)_yNH_2$; wherein the alkyl group can vary within the moiety, wherein x is 1–8 (which can vary within the moiety) and y is an integer of 1 to 40; alkylamines, dialkylamines, trialkylamines, alkyltetramines, polymers with amino or (alkyl or aryl)amino substituent groups, polymers with nitrogen-containing heterocyclic groups, acrylamide, polymers and copolymers of acrylamide, vinyl pyrollidone, polyvinyl pyrollidone, copolymers of vinyl pyrollidone, methacrylamide, polymethacrylamide, copolymers of acrylamide, and ammonia (which when combined with HCl forms ammonium chloride, which dissolves water-insoluble salts at a slow rate). Mixtures of these bases can also be used.

### DETAILED DESCRIPTION OF THE INVENTION

The term water insoluble salt refers to a salt that is soluble in water at a concentration of not greater than 1, and typically not greater than 0.1 gm/liter, under ambient conditions. The term water soluble salt refers to a salt that is soluble in water at a concentration of greater than that of a water insoluble salt.

The term alkyl, as used herein, unless otherwise specified, refers to a saturated straight, branched, or cyclic (in the case of $C_5$ or greater) hydrocarbon of $C_1$ to $C_{20}$, and specifically includes methyl, ethyl, propyl, isopropyl, butyl, isobutyl,

5,672,279

**3**

-butyl, pentyl, cyclopentyl, isopropyl, hexyl, isohexyl, cyclohexyl, 3-methylpentyl, 2,2-dimethylbutyl, 2,3-dimethylbutyl, heptyl, octyl, nonyl, decyl, and dodecyl.

The term aryl, as used herein, refers to phenyl and substituted phenyl, wherein the substituent is amino, alkyl, halo (chloro, bromo, iodo, or chloro), hydroxy, sulfonyl, carboxylic acid, nitro, or a combination of these, and wherein the aromatic ring can have up to three substituents.

The invention as disclosed is, in one embodiment, a method to remove the build-up of water-insoluble metal salts on surfaces, and a method to lower the solids content of industrial liquids that contain water-insoluble metal salts using urea hydrochloride or its equivalent. In one embodiment, a method is provided to adjust the pH of textile treatment baths, effluent streams, and processing water, including effluent from paper manufacturing and recycling, using urea hydrochloride or its equivalent. Urea hydrochloride can also be used to adjust the pH of dying baths, and other aqueous baths, including recreational waters such as swimming pools and hot tubs.

Urea hydrochloride, as well as the equivalent strong acid/weak base salts disclosed herein, can also be used as an acid replacement in any process that uses hydrochloric acid (also referred to as muriatic acid) has traditionally been used in, including but not limited to acidizing (activation) of petroleum wells, boiler scale removal, ore reduction, food processing (e.g. corn syrup and sodium glutamate), pickling and cleaning of membrane in desalination plants), alcohol denaturing, meat cleaning, industrial acidizing, general cleaning (e.g. of membrane in desalination plants), alcohol denaturing, production of vinyl chloride from acetylene and alkyl chlorides from olefins, hydrochlorination, polymerization reactions, isomerization, alkylation, and nitration reactions. Urea hydrochloride can replace traditional acids for solvation, in aqueous cleaning solutions, and in other processing solutions. Materials that can be cleaned include wire, metals, jewelry, printed circuit boards, wood, masonry, mortar, concrete, painted surfaces, plastics, polymeric substances, and the like.

In a preferred embodiment, urea hydrochloride or its equivalent disclosed herein is used to solubilize water insoluble metal salts, such as carbonates, for example, those with calcium, barium, aluminum, beryllium, and magnesium counterions.

Urea hydrochloride, as well as the equivalent strong acid/weak base salts disclosed herein, can also be used to prepare surfaces for electroplating, and to clean surfaces used in the electronics industry.

Preparation of Urea Hydrochloride

Urea hydrochloride is a salt formed from the simple mixture of urea with hydrochloric acid. Common urea hydrochloride salts include the 1:1 urea to hydrochloric acid salt (CAS 506-89-8), and the 2:1 urea to hydrochloric acid salt. The 1:1 urea hydrochloride acid salt is sold by Esprit Chemical Company (Rockland, Mass.). Any desired ratio of urea to hydrochloric acid that performs the desired function can be prepared by simply mixing the appropriate ratios of hydrochloric acid and water. The mixing of urea with hydrochloric acid typically results in a slight exotherm that should be handled with care.

Any amount of urea hydrochloride can be used in the methods described herein, with any molar ratio of urea and hydrochloric acid. The preferred composition is a solution of hydrochloric acid and urea combined in a molar ratio of at least approximately 1 mole of urea to one mole of hydrochloric acid, or a slight

**4**

excess of urea, in water. This composition results in a hydrochloric acid urea salt solution that has the pH reduction ability and insoluble metal salt dissolution ability of hydrochloric acid but is less corrosive than hydrochloric acid.

Given the disclosure herein, one of ordinary skill in the art can easily manipulate the ratio of urea and hydrochloric acid, and the amount of urea hydrochloride used, to obtain a desired result. Methods to determine pH are well known to those of skill in the art.

It is recommended that the desired salt, as opposed to the individual components, be added to aqueous solutions to avoid a dilution effect, and as well as to solve safety problems associated with addition of the strong acid in the uncomplexed form.

Additives

Additives can be added to the urea hydrochloride or equivalent solution as desired to increase the usefulness of the agent.

Additives include, but are not limited to, surfactants, alkyl sulfonic acid or aryl sulfonic acid, specifically including (for example sodium or ammonium salts of alkyl sulfonic acid or aryl sulfonic acid, specifically including xylene sulfonic acid, toluene sulfonic acid, benzene sulfonic acid, cumene sulfonic acid, dodecylbenzene sulfonic acid, dodecyl diphenyloxide disulfonic acid, and naphthalenic acid), corrosion inhibitors, nitric acid (to increase the strength of the acid), cleaning agents (including detergents and shampoos), emulsifiers, and appropriate organic solvents.

Surfactants and emulsifiers are surface active agents that modify the surface energy between two liquid phases. The characteristics of surfactants and their applicability for a wide variety of applications are described by Rosen (John Wiley and Sons, N.Y.), incorporated herein by reference. In Surfactants and Interfacial Phenomena, 2nd Edition (John Wiley and Sons, N.Y.), incorporated herein by reference. In general, the desired chemical structures will vary with the nature of the solvent and the conditions of use. As discussed by Rosen, in a highly polar solvent such as water, the hydrophobic group can be, for example, a hydrocarbon, fluorocarbon or siloxane chain of proper length, whereas in a less polar solvent such as an alcohol, a very nonpolar moiety is required in the hydrophobic part of the surfactant. If a surface is to be made hydrophobic by the use of a surfactant, a cationic surfactant is usually preferred. If a surface is to be made hydrophilic, in general, then anionic surfactants should be considered. Nonionic surfactants adsorb onto surfaces with either the hydrophilic or hydrophobic group oriented toward the surface, depending on the nature of the surface.

EXAMPLE 1

Preparation of Urea Hydrochloric Acid 1:1 Salt.

To muriatic acid (65 parts of 20 degree baume [31.45% minimum, 22.5% average by weight]) was added purified urea (35 parts). The mixture was mixed at room temperature, during which time a slight exotherm occurred.

EXAMPLE 2

Preparation of Urea Hydrochloric Acid 2:1 Salt.

To muriatic acid (130 parts of 20 degree baume [31.45% minimum, 22.5% average by weight]) is mixed purified urea (35 parts). The mixture is mixed at room temperature, during which time a slight exotherm occurs.

Strong Acid Weak Base Salts As Equivalents to Urea Hydrochloride

In an alternative embodiment, a salt formed by the combination of a strong acid with a weak base other than urea

5,672,279

| 5 | 6 |

hydrochloride is used to remove the build-up of water-insoluble metal salts on surfaces, and to lower the insoluble solids content of industrial liquids that contain water-insoluble metal salts.

A strong acid/weak base salt should be selected that forms a water soluble salt when mixed with a water insoluble salt under the conditions of use. Certain salts of urea, such as urea sulfate, cannot be used, for example, to remove the build-up of calcium carbonate because they form new water insoluble salts, i.e., calcium sulfate.

Strong acids are acids that are completely ionized in water. Ebbing, D. D., and Wrighton, M. S., "General Chemistry. Second Edition." Houghton Mifflin Company, Boston. pp. 327 (1987). Examples of strong acids include mineral acids such as nitric, hydrochloric, hydrobromic, hydroiodic, hydrofluoric, and others. Some acids commonly considered "weak" acids are also suitable, including but not limited to formic, acetic, hydroxyacetic, and thioglycolic acids.

Weak bases are bases that are only partly ionized in water. Ebbing, D. D., and Wrighton, M. S., "General Chemistry. Second Edition." Houghton Mifflin Company. Boston. pp. 327 (1987). Nonlimiting examples of organic and inorganic bases are found on pages 8–37 through 8–39 in the "CRC Handbook of Chemistry and Physics." 72nd Edition, CRC Press, (1992), hereby incorporated by reference. Examples of weak bases include urea acetylurea, alkanolamines, including triethanolamine, diethanoamine, monoethanolamine and $HO—[(alkyl)O]_x—CH_2)_yNH_2$, including $HO—(CH_2)_xO]—CH_2)_yNH_2$; wherein the alkyl group can vary within the moiety, wherein x is 1–8 (which can vary within the 5 moiety) and y is an integer of 1 to 40; alkylamines (including methylamine, ethylamine, propylamine and butylamine), dialkylamines, alkyldiamines (including ethylenediamine), alkyltriamines, alkyltetramines, and trialkylamines, polymers with amino or (alkyl or aryl)amino substituent groups, including (mono or di)-alkylaminoalkylacrylate, and (mono or di)alkylaminoalkylmethacrylate, polymers with nitrogen-containing heterocyclic groups (including but not limited to pyridine, pyrimidine, imidazole, tetrazole, pyrazine, quinoline, isoquinoline, indole, isoindole, benzimidazole, purine, pyrrole, is pyrazole, quinazoline, pyridazine, pyrazine, cinnoline, phthalazine, quinoxaline, xanthine, hypoxanthine, and pteridine); amides, including formamide, acetamide, acrylamide, polymers and copolymers of acrylamide, and cyclic amides such as caprolactam; pyrrolidone, polyvinyl pyrrolidone, copolymers of vinyl pyrrolidone, methacrylamide, polymethacrylamide, copolymers of methacrylamide, ammonia, guanidine, hydroxyurea, semicarbazide; mono-, di-, or tri(alkyl or aryl)urea, and wherein in the case of di(alkyl or aryl)urea the alkyl or aryl groups can be on the same or different nitrogen atoms, O-methyl hydroxyl amine (methoxylamine), aniline, and hydrazine. Preferred bases are nitrogeneous bases. Certain metal hydroxides, such as calcium and barium hydroxide, are weak bases and have low solubility in neutral media. However, they react with strong acids to form water and metal salts. These bases are not preferred because the resulting metal salts are relatively insoluble, compared to the acid salts of nitrogenous bases.

Examples of suitable salts include any salt that is formed by the combination of one or more of the acids listed above with one or more of the bases listed above, in any desired molar ratio. Examples specifically include urea hydrogen nitrate, ammonium chloride, urea hydrobromide, urea hydroiodide, urea hydrofluoride, formamide hydrochloride,

and the HCl, HI, HBr, or HF salts of pyrrolidone or polyvinylpyrrolidone.

As a nonlimiting example, a 1:1 HCl salt of polyvinylpyrrolidone (PVP) can be prepared by mixing 36 grams of 20 degree baume HCl with 36 grams of PVP (average MW 29,800) and 28 grams of water.

A useful composition is a mixture of HCl, $HNO_3$, and urea, in any selected ratio. Mixtures of HCl and $HNO_3$ are known as aqua regia, a very strong acid that can dissolve almost any material, including gold. $HCl/HNO_3$ mixtures are commonly used to clean very dirty equipment. A disadvantage of $HCl/HNO_3$ is its extreme corrosiveness and its noxious fumes. A mixture of HCl, $HNO_3$, and urea provides the benefits of aqua regia while minimizing its corrosiveness and fumes. In a preferred composition, an amount of urea or other weak base, or combination thereof, is used that is at least equal to, and preferably greater than, the combined acid units of HCl and $HNO_3$ based on equivalents.

Any molar ratio of strong acid to weak base that serves the desired purpose can be used within the scope of this invention. Typical ratios, in terms of acid or base equivalents, are typically between approximately 4 to 1 and 1 to 4 acid:base equivalent units or a slight excess of base, in equivalence units. As with urea hydrochloride, at least one equivalent unit of base, or a slight excess of base, per equivalent unit of acid, is preferred.

Combinations of any of the weak bases described herein in combination with nitric acid, for example, urea nitrate, can be used as an acid replacement for any purpose that nitric acid is used for, including but not limited to, in the manufacture of ammonium nitrate for fertilizer and explosives, in organic syntheses, including in the preparation of nitro-containing compounds, in metallurgy, in photoengraving, in etching steel, in ore floatation, in the production of urethane and rubber chemicals, and in reprocessing spent nuclear fuel.

Combinations of any of the weak bases described herein in combination with hydrofluoric acid, such as urea hydrofluoride, for example, can be used as an acid replacement for any purpose that hydrofluoric acid or hydrogen fluoride is used for, including but not limited to, as a catalyst in alkylation, isomerization, condensation, dehydration, and polymerization reactions, as a fluorinating reagent in organic and inorganic reactions, in the production of aluminum, fluorine and aluminum fluoride, as an additive in liquid rocket propellants, in etching glass, in pickling stainless steel, and in the refining of uranium. Combinations of any of the weak bases described herein in combination with hydroiodic acid, such as urea hydroiodide, for example, can be used as an acid replacement for any purpose that hydroiodic acid or hydrogen iodide is used for, including but not limited to, the preparation of iodine salts, in organic preparations, as an analytical reagent, as a disinfectant, and in the preparation of pharmaceuticals.

### Use of Urea Sulfate or its Equivalent

The following examples are nonlimiting examples of procedures for the removal of the build-up of water-insoluble metal salts on surfaces, and the dissolution of water-insoluble metal salt dispersions or suspensions. Given these examples, anyone of skill in the appropriate art can use the method disclosed herein to achieve the desired purpose.

### EXAMPLE 3

#### Use of Urea Hydrochloride to Clean Masonry

A solution of urea hydrochloride is prepared by mixing 1 part water with 1 part of the produce of Example 1. The solution is applied to masonry, and the masonry optionally

5,672,279

7

brushed or otherwise abraded appropriate. The masonry is then rinsed off with water.

### EXAMPLE 4

Use of Urea Hydrochloride to Clean Boiler Scale

A solution of urea hydrochloride is prepared by mixing 3 parts water with 1 part of the product of Example 1. The boiler is filled with the solution, and then flushed as appropriate, typically after cessation of $CO_2$ evolution.

Modifications and variations of the present invention will be obvious to those skilled in the art from the foregoing detailed description of the invention. Such modifications and variations are intended to come within the scope of the appended claims.

8

We claim:

1. A method to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes adding to the suspensions or dispersions a sufficient amount of urea hydrochloride to convert the calcium carbonate to a water soluble salt, wherein a molar ratio of urea to hydrochloric acid approximately between 1:4 and 4:1 is used to form said urea hydrochloride.

2. The method of claim 1, wherein the calcium carbonate is in paper manufacturing process water.

3. The method of claim 1, wherein said ratio of urea to hydrochloric acid is approximately 2:1.

4. The method of claim 1, wherein said ratio of urea to hydrochloric acid is approximately 1:1.

5. The method of claim 1, wherein the calcium carbonate is in paper recycling process water.

* * * * *