# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**PEACH STATE LABS, INC.,**

   **Plaintiff,**

-vs-                                                              Case No. 6:09-cv-395-Orl-28DAB

**ENVIRONMENTAL MANUFACTURING
SOLUTIONS, LLC,**

   **Defendant.**
_____/

## ORDER

The instant patent infringement controversy involves the removal of unwanted calcium carbonate. Calcium carbonate is often produced and used in industrial processes, but is only slightly soluble in water, causing it to deposit on surfaces and build up in industrial liquids. The disputed patent owned by Peach State Labs, Inc. ("Peach State") relates to a method of using urea hydrochloride to remove unwanted calcium carbonate by converting it to a water soluble salt. A jury found the patent at issue to be infringed by Environmental Manufacturing Solutions, LLC ("EMS").

Peach State now moves for the entry of a permanent injunction under 35 U.S.C. § 283.[1] Having considered all of the papers filed by the parties and the evidence presented including the

---

[1] The Motions presently before the Court include the following: (1) Motion and Supporting Brief for Entry of Permanent Injunction by Peach States Labs, Inc., (Doc. 210, filed May 2, 2011); (2) Memorandum in Opposition to Peach State Labs, Inc.'s Motion for Entry of Permanent Injunction by Environmental Manufacturing Solutions, LLC, (Doc. 233, filed May 27, 2011); Submission of, and Motion for Adoption of, Modified Proposed Injunction Per Court Order by Peach State Labs, Inc., (Doc. 269, filed July 28, 2011); and (4) Objections to Peach State Labs, Inc.'s Proposed Form of Modified Proposed Injunction by Environmental Manufacturing Solutions, LLC, (Doc. 270, filed July 28, 2011).

evidence presented at the July 26, 2011 evidentiary hearing concerning litigation misconduct, the Court grants Peach State's request under the traditional principles of equity.[2]

### Background

### I. Procedural History

EMS filed the present action against Peach State seeking a declaratory judgment that United States Patent No. 5,672,279 ("the '279 patent") is invalid and not infringed by EMS. (Doc. 1 at 9). Along with its Answer, Peach State filed a Counterclaim alleging that the use of EMS Ready Mix, Blow Out, Barracuda, Basic CR, SynTech I, SynTech pH, and Eximo products in accordance with the instructions and applications identified in EMS's product literature infringe the '279 patent. (Doc. 29 at 11-12). Peach State additionally alleged that EMS contributed to and/or induced infringement of the '279 patent by others and that EMS's infringement is and has been willful. (*Id.* at 12-13).

The parties disputed the proper construction of several terms of the '279 patent, and a pretrial claim construction hearing was conducted in accordance with *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). (Docs. 41-42). Following the hearing, a Markman Order was entered construing

---

[2] The Court is aware that several motions remain pending including the Motion for Renewed Judgment as a Matter of Law as to Non-Infringement by Environmental Manufacturing Solutions, LLC, (Doc. 228, filed May 16, 2011), and the Motion for New Trial by Environmental Manufacturing Solutions, LLC (Doc. 229, filed May 16, 2011). Both Motions are hereby **DENIED**. Separate orders directly addressing the denial of these motions on the merits will be entered shortly. In the interest of justice, however, the Court will enter the present Order addressing the Motion for Permanent Injunction, (Doc. 210), before entering the orders formally addressing the merits of the Motion for Judgment as a Matter of Law, (Doc. 228), and Motion for a New Trial, (Doc. 229). Additionally, the Court is aware that the Motion and Supporting Brief for Entry of Final Judgment, Award of Enhanced Damages, and Attorney's Fees by Peach State Labs, Inc. (Doc. 212, filed May 3, 2011), remains pending. The Court will enter final judgment consistent with the jury's factual findings on the issue of infringement of the '279 patent in the present Order. (Doc. 204 at Section I.A-B). All other issues raised in the Motion for Final Judgment, (Doc. 212), will be addressed in a separate order to be entered at a later date.

the contested claims. (Doc. 96). The parties then moved for summary judgment on the issues of validity and infringement. The Court granted Peach State's summary judgment motion, finding that EMS failed to create a genuine issue of material fact relating to the invalidity of the '279 patent under 35 U.S.C. §§ 102, 103, or 112, as well as to the affirmative defense of patent misuse. (Doc. 169). On the other hand, the Court granted EMS's summary judgment motion to the extent it sough a finding that EMS did not contribute to or induce the infringement of the '279 patent by producing and instructing others to use the EMS Syntech I product. (*Id.* at 40). On April 18, 2011, a jury found that EMS willfully infringed claim 1 of the '279 patent and awarded damages to Peach State. (Doc. 204). Following an evidentiary hearing held on July 26, 2011, the Court determined that EMS engaged in litigation misconduct sufficient to meet the standard for enhanced damages and attorney's fees. (Doc. 262).

## II. Patent at Issue

The '279 patent, titled "Method for Using Urea Hydrochloride," issued on September 30, 1997 and is assigned to Peach State. (Doc. 42-3 at 1). The invention claimed in the '279 patent relates to a method of solubilizing calcium carbonate, which is often produced and used in industrial processes, but is only slightly soluble in water. Due to its limited solubility, calcium carbonate tends to deposit on surfaces and build up in industrial liquids, and its accumulation adversely affects industrial processes and equipment. The '279 patent involves the use of urea hydrochloride to remove unwanted calcium carbonate from aqueous suspensions or dispersions of calcium carbonate by converting the calcium carbonate to a water soluble salt.

### III. EMS Products

Peach State alleged that the use of certain EMS products in accordance with the instructions and applications identified in EMS's product literature infringe the '279 patent. (Doc. 29 at 11). The EMS products accused of infringing the '279 patent include: (1) EMS Ready-Mix; (2) Barracuda; (3) EMS Basic CR; (4) EMS BlowOut; (5) EMS SynTech pH; and (6) Eximo ("Accused Products"). EMS Ready-Mix, Barracuda, and EMS Basic CR are generally used to remove concrete. EMS Blowout is a line surface cleaner and descaler used to dissolve calcium, lime, scale, milk stone, beer stone, and other deposits. EMS SynTech pH is used to lower the pH of reclaimed water, and Eximo is a soil conditioner designed to be sprayed directly onto turf to solubilize calcium and other salts.[3]

## Analysis

### I. Equitable Factors

Peach State contends that EMS should be permanently enjoined from further acts of infringement because all four factors outlined by the Supreme Court in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), align in Peach State's favor. (Doc. 210 at 5). In response, EMS contends that a permanent injunction should not issue because the remedies available to Peach State at law are sufficient to compensate for EMS's infringement. (Doc. 233 at 5, 13).

The Patent Act expressly provides that injunctions "may" issue "in accordance with principles of equity." 35 U.S.C. § 283. Traditionally, patent holders enjoyed a rebuttable presumption that a permanent injunction should be automatically awarded upon a showing of validity and infringement.

---

[3] While EMS Syntech I was initially included among the Accused Products, the Court determined on summary judgment that the use of EMS Syntech I did not infringe the '279 patent. (Doc. 169 at 40). Accordingly, the term "Accused Products" in the present Order does not include EMS Syntech I.

*eBay Inc.*, 547 U.S. at 391. However, in 2006, the Supreme Court rejected this rebuttable presumption, finding instead that "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and [] such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." *Id.* at 394. Thus, a patentee seeking a permanent injunction must demonstrate:

> (1) that it has suffered irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardship between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* at 391 (citations omitted). The Court will consider each of these factors in turn.

### A. Irreparable Injury

The first factor to consider is whether Peach State "has suffered an irreparable injury." *eBay Inc.*, 547 U.S. at 391. "The essential attribute of a patent grant is that it provides a right to exclude competitors from infringing the patent. In view of that right, infringement may cause a patentee irreparable harm not remediable by a reasonable royalty." *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) (citing 35 U.S.C. § 154(a)(1)). Therefore, "[a]lthough a presumption of irreparable harm is inconsistent with the Supreme Court's instruction that traditional equitable principles require *the plaintiff* to demonstrate that it has suffered an irreparable injury, the court is not blind to the reality that the nature of the right protected by a patent, the right to exclude, will frequently result in a plaintiff successfully establishing irreparable harm in the wake of establishing validity and infringement." *MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 569 (E.D. Va. 2007) (citation omitted). Even when considered under traditional equitable rules, courts have found

that "the existence of a likely infringer in the market may suffice to demonstrate irreparable harm because of the 'difficulty of protecting a right to exclude through monetary remedies.'" *Tiber Labs., LLC v. Hawthorn Pharm., Inc.*, 527 F. Supp. 2d 1373, 1380 (N.D. Ga. 2007) (quoting *eBay Inc.*, 547 U.S. at 395 (Roberts, C.J. concurring)).

Peach State has demonstrated that it suffered irreparable injury as a result of EMS's infringement of the '279 patent. It is well established that "[t]he fact that there is direct competition in a marketplace weighs heavily in favor of a finding of irreparable injury." *Mass Engineered Design, Inc. v. Ergotron, Inc.*, 633 F. Supp. 2d 361, 393 (E.D. Tex. 2009); *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 558 (D. Del. 2008) ("Courts awarding permanent injunctions typically do so under circumstances where [the] plaintiff practices its invention and is a direct market competitor."); *Bendix Commercial Vehicle Sys., LLC v. Haldex Brake Prods. Corp*, No. 1:09 CV 176, 2011 WL 14372, at *5 (N.D. Ohio Jan 3, 2011) (collecting cases and noting that "[c]ourts routinely and rightly find irreparable harm when the infringer and the patentee are direct competitors."). In the present case, the record reflects that at the time of its infringement, EMS was in direct competition with Peach State to the extent that both Peach State and EMS manufactured urea hydrochloride as a raw material to be incorporated into final products used in accordance with the method claimed in the '279 patent.[4] This direct competitive relationship is evidenced by the fact that EMS stopped purchasing urea hydrochloride from Peach State for use in EMS's products after EMS began to manufacture the raw material itself, despite the fact that EMS continued to produce the

---

[4] While EMS contends that Peach State and EMS are not direct competitors, the citations used to support this proposition refer to the relationship between the parties prior to EMS's decision to manufacture urea hydrochloride as a raw material for products that can be used to practice the methods claimed in the '279 patent.

infringing products. *See Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996) ("Competitors change the marketplace. Years after infringement has begun, it may be impossible to restore a patentee's . . . exclusive position by an award of damages and a permanent injunction.").

The record also reflects that Peach State and EMS operated within the same distribution chain involving the sale of urea hydrochloride as a raw material to be incorporated into products used in the manner claimed by the '279 patent. (Doc. 221 at 115-17; Doc. 222 at 24-34). The testimony offered at trial demonstrates that Peach State did not pursue relationships with specific customers as a result of its relationship with EMS, instead opting to either allow EMS to pursue the relationship, as was the case with Aquatrols, or declining to enter into the relationship altogether because the customer was in competition with EMS, as was the case with Power Kleen.[5] (Doc. 221 at 86-88). Furthermore, EMS repeatedly identified companies, including its own competitor Growing Technologies, that were potentially infringing the '279 patent and sought Peach State's assistance in ending its competitors' infringement, including having Peach State send cease and desist letters to such potential infringers. (Doc. 221 at 118-25). Thus, the present case is distinguishable from those cases wherein the patentee followed a consistent course of seeking to maximize the royalties it received by freely licensing its patent to any market participants such that an infringer represents no more than an additional licensee subject to a predictable license agreement. *See MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 570 (E.D. Va. 2007) (finding that the patentee failed to established irreparable harm because the patentee had "followed a consistent course of seeking to maximize the *money* it can obtain from licensing its patents to market participants allegedly utilizing such patents; a substantial damages

---

[5] Similarly, Peach State initially declined to sell its Novoc ACL product to EMS for use in the transportation industry in light of Peach State's exclusive agreement with Vitech. (Doc. 221 at 84).

award against [the infringer] . . . will accomplish precisely such goal."). Quite to the contrary, the record demonstrates that Peach State engaged in complex business arrangements—selling its urea hydrochloride products to partners in a particular industry with an implied license to practice the '279 patent in an effort to bring Peach State technologies into different markets—in light of its position as "a technology company more than a sales company." (Doc. 221 at 116; Doc. 222 at 98-100). In fact, Peach State never licensed the '279 patent independent of the sale of its urea hydrochloride products. (Doc. 222 at 98).

The Supreme Court "specifically cautioned against the application of categorical rules, classifications and assumptions in [the analysis of irreparable harm.]" *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 531 (D. Del. 2008) (citing *eBay Inc.*, 547 U.S. at 392-93). Thus, while many of the categorical factors typically supporting the entry of a permanent injunction are present, it is the interaction of the unique facts and circumstances of the case at bar upon which this Court finds Peach State has suffered irreparable harm. These unique facts and circumstances include Peach State's implied licensing activity coupled with its production of the raw material used to practice the invention, the nature of the now competitive relationship between the parties, and the complexity of their prior business arrangement. Accordingly, the first factor weighs heavily in favor of granting equitable relief.

### B. Adequacy of Remedies Available at Law

Peach State next argues that monetary damages will not provide a sufficient remedy for future infringement because a compulsory license would allow EMS to continue to disrupt Peach State's

business model. In response, EMS contends that the royalty rate employed by the jury to calculate damages for past infringement is a sufficient remedy for future infringement.

"[T]he requisite analysis for the second factor of the four-factor test inevitably overlaps with that of the first." *MercExchange*, 500 F. Supp. 2d at 582. As previously discussed, a violation of the right to exclude does not compel the conclusion that a patent holder cannot be adequately compensated by remedies at law, such as monetary damages. *eBay Inc.*, 547 U.S. at 392-93. However, both before and after *eBay*, courts have routinely found monetary damages inadequate to remedy injury to the patent holder's right to exclude.[6] *See, e.g., Smith & Nephew Inc. v. Synthes*, 466 F. Supp. 2d 978, 984 (W.D. Tenn. 2006) ("Even if monetary damages were provable . . . , that relief would not necessarily be equitable. It is not enough that there is a remedy at law; it must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." (quotation omitted)).

Peach State does not indiscriminately offer third parties a boilerplate license to the use of the '279 patent. Instead, Peach State engages in more complex licensing arrangements by looking for partners in a particular industry where Peach State is not a leader and selling its urea hydrochloride products to these partners with an implied license to practice the '279 patent in an effort to bring Peach State's technology into these markets. (Doc. 221 at 115; Doc. 222 at 98-99); *see Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 612 (D. Del. 2007) (entering a permanent injunction where the patentee licenses the patents in exchange for not only a royalty, but also an expectation that the

---

[6] As stated by Chief Justice Roberts in his concurrence to *eBay Inc.*, "a page of history is worth a volume of logic" and "there is a difference between exercising equitable discretion pursuant to the established four-factor test and writing on an entirely clean slate." 547 U.S. at 395 (Roberts, C.J., concurring) (quotation and citation omitted).

value of its subsidiary will increase with the successful marketing of the licensed technology). The previously described business relationship between EMS and Peach State serves to exemplify the complexity of Peach State's patent licensing model for the '279 patent. Notably, Peach State worked cooperatively with EMS over a number of years to grow EMS's market share, even at the expense of potential Peach State licensees. (*See, e.g.*, Doc. 221 at 86-88; Doc. 222 at 124-26).

In light Peach State's complex licencing model for the '279 patent and the intangible value of lost licensing opportunities and related business relationships, EMS's infringement of the '279 patent resulted in a violation of Peach State's exclusionary right that cannot be compensated adequately through a simple reasonable royalty or other monetary remedy. *See Judkins v. HT Window Fashions Corp.*, 704 F. Supp. 2d 470, 477 (W.D. Pa. 2010) (finding monetary damages inadequate where patentee did more than "collect royalty checks in arms length transactions with random licensees," but instead "buil[t] long term relationships with leaders in the window blinds industry," and determining that in light of this licensing arrangement, the infringer's harm to the patentee's licensing relationships and the resulting loss of the "tangential benefits" associated with those relationships could not be "quantified and remedied completely with money"); *Novozymes*, 474 F. Supp. 2d at 613 (finding monetary damages to be inadequate and noting that the patentee "has a right, granted by Congress, not to assist its rival with the use of proprietary technology"). Accordingly, the second factor weighs in favor of granting equitable relief.

### C. Balance of Hardships

The balance of hardships favors an equitable remedy in this case. The record does not reflect that a permanent injunction would have a serious impact on EMS's business. Furthermore, EMS took

the position at trial that the urea hydrochloride in EMS's products provides, at most, only a slight competitive benefit, and EMS now contends that it "plans to completely abandon use of urea hydrochloride in all Accused Products as quickly as possible," removing the urea hydrochloride "within a matter of months." (Doc. 233 at 16-17). In fact, EMS maintains that it has already developed a new, non-urea hydrochloride formula for all of the Accused Products and has filed a copy of Dr. Tandy Grubbs' test result for four such reformulated products in an effort to confirm that urea is not present in the new formulations. (*Id.* at 17). Thus, by its own admission, any harm suffered by EMS would be short in duration and "limited to the injury ordinarily expected when an injunction is imposed." *Smith & Nephew*, 466 F. Supp. 2d at 984 (finding that the balance of hardship weighed in favor of patentee because "[o]nly hardship to the defendant that is not an inseparable part of the plaintiff's right is cognizable" (quotation omitted)).

EMS next argues that an injunction is unnecessary in light of EMS's proposed remedial actions. However, the fact that an infringer will voluntarily cease infringement is "generally not a reason for denying an injunction against future infringement unless the evidence is very persuasive that future infringement will not take place." *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1281-82 (Fed. Cir. 1988) (citation omitted). As noted by the Federal Circuit, "[t]he argument in such circumstances is very simple. If the defendant be honest in his protestations an injunction will do him no harm; if he be dishonest, the court should place a strong hand upon him." *Id.* at 1282 (quotation omitted). In the present case, there is nothing in the record to suggest that EMS no longer has the capacity to make the Accused Products with urea hydrochloride, EMS has yet to receive, and may never receive, approvals for the reformulated products in question, and both parties repeatedly

offered testimony at trial relating to the usefulness and desirability of products formulated with urea hydrochloride. As a result, the evidence of record is not sufficiently persuasive to permit EMS's mere promises of future noninfringement to weigh against granting an injunction.

Accordingly, when compared to the harm to Peach State in the absence of a permanent injunction described in detail in Sections I and II, the balance of hardships weighs in favor of granting equitable relief. *See Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.").

### D. The Public Interest

As a general matter, the public maintains an interest in protecting the rights of patent holders, and the "[s]uccessful exploitation" of the patent by the infringer does not allow the infringer to avoid a permanent injunction. *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008); *TiVo Inc. v. EchoStar Commc'ns Corp.*, 446 F. Supp. 2d 664, 670 (E.D. Tex. 2006) ("The public has an interest in maintaining a strong patent system. This interest is served by enforcing an adequate remedy for patent infringement."), *rev'd on other grounds*, 516 F.3d 1290 (Fed. Cir. 2008). However, the public interest factor may be implicated in situations where "the product at issue is of unusual social benefit." *Presidio Components Inc. v. Am. Technical Ceramics Corp.*, 723 F. Supp. 2d 1284, 1339 (S.D. Cal. 2010) (citation omitted) (finding the public interest factor implicated where the infringer argued "persuasively" that enjoining the sale of the infringing product would hurt important government, military, space, and infrastructure projects, as well as critical civilian industries);

*Advanced Cardiovascular Sys.*, 579 F. Supp. 2d at 561 (finding "[a] strong public interest in maintaining diversity in the coronary stent market.").

In the present case, the record does not support a finding that EMS's products are of unusual social benefit or that similar products cannot be obtained from competitors. While EMS contends that an injunction will force government, military, and civilian projects to suddenly halt until new governmental and industry approvals can be obtained, EMS provides no evidentiary support for this contention. Accordingly, the public interest factor weighs in favor of granting equitable relief.

### E. Conclusion

After considering the traditional equitable factors, the Court concludes that the balance of equities warrants injunctive relief. Peach State has demonstrated that it suffered irreparable injury as a result of EMS's infringement, that the remedies available at law are inadequate to compensate for that injury, and that both the balance of hardship and the public interest factors weigh in favor of granting injunctive relief. Accordingly, Peach State's request for a permanent injunction will be granted.

## II. Scope of Injunction

Peach State has provided a proposed injunction and a modified proposed injunction. (Docs. 210, 269.) EMS opposes the entry of either proposed injunction, contending that their scope enjoins conduct far beyond what is necessary to remedy he harm claimed. (Doc. 233 at 20). EMS maintains that an injunction preventing EMS from using urea hydrochloride in the Accused Products would be sufficient to protect Peach State's exclusive right to the method claimed in the '279 patent. (*Id.*).

In light of the particular facts and circumstances of the present case, including the Court's previous findings regarding litigation misconduct and the difficulty in assessing any future infringement by EMS—a difficulty inherent in the particular marketplace for the products at issue—the injunction proposed by Peach State is, for the most part, reasonable as required by 28 U.S.C. § 283. Specifically, the Court concludes that the injunction is properly applied to both the Accused Products[7] and those products presented during the July 26, 2011 evidentiary hearing in light of the uncontested evidence demonstrating that these additional products are no more than colorable variations of the Accused Products that clearly infringe the '279 patent. Moreover, it is clear that but for EMS's litigation misconduct, these additional products would have been disclosed to Peach State and included in the underlying jury trial. Thus, in an exercise of equitable discretion, the Court will specifically include these products within the scope of the injunction. To find otherwise would permit EMS to reap significant benefits from its misconduct. Accordingly, the products subject to the present injunction include: (1) the Accused Products; (2) EMS Ready Mix Truck Wash (EL); (3) EMS Ready Mix Truck Wash (MA); (4) EMS SapH; (5) EMS SapH WT,[8] and all concentrated versions of the

---

[7] The Accused Products include: (1) EMS Ready-Mix; (2) Barracuda; (3) EMS Basic CR; (4) EMS BlowOut; (5) EMS SynTech pH; and (6) Eximo.

[8] Based on the evidence presented at the hearing held on July 26, 2011, the Court concludes that EMS SapH is the same product as EMS Syntech pH. This finding is supported by the fact that the product literature for EMS SapH and EMS Syntech pH is identical aside from the product names and two logos on the bottom of the product brochure. (*Compare* Doc. 126-27 at 30 with Def. Ex. 536A). Additionally, the Court concludes that if EMS SapH WT is at all different from EMS SapH and EMS Syntech pH, it is only colorably different and therefore subject to the terms of the present injunction. This finding is supported by the relevant product literature, (*see* Def. Ex. 56 and EMS001338), and record evidence demonstrating that (1) EMS SapH WT was assigned the same batch number as EMS Syntech pH following the discontinuation of EMS Syntech pH, and (2) that the discontinuation of EMS Syntech pH coincided with the creation of EMS SapH WT. The Court discredits Mr. McDonald's testimony to the contrary.

foregoing products, including without limitation Ready Mix Hyper Concentrate (or Ready Mix HC), Syntech pH Hyper Concentrate (or Syntech pH-HC), Barracuda 10K, Barracuda Hyper (or Barracuda Hyper Concentrate), Barracuda 10K-Hyper (or Barracuda 10K Hyper Concentrate), Basic CR+, and all colorable imitations of the same (collectively "Infringing Products"). However, in light of the fact that the Infringing Products involve a number of EMS trade secrets, the Court does not agree with Peach State's proposition that the required certification, samples, and test results should be provided to Peach State directly. Instead, in an effort to balance the need to protect EMS's trade secrets with the need to ensure that EMS complies with the present injunction, EMS will be directed to provide this information to Peach State's outside counsel.

## Conclusion

Based on the foregoing, the Renewed Motion for Judgment as a Matter of Law as to Non-Infringement by Environmental Manufacturing Solutions, LLC, (Doc. 228, filed May 16, 2011), and the Motion for New Trial by Environmental Manufacturing Solutions, LLC (Doc. 229, filed May 16, 2011) are **DENIED**. The Clerk of Court is directed to enter final judgment for Peach State Labs, Inc. in accordance with the portion of the Verdict Form labeled Indirect Infringement—Inducing Infringement, (Doc. 204 at I.A.), and Indirect Infringement—Contributory Infringement, (Doc. 204 at Section I.B.). The Motion and Supporting Brief for Entry of Permanent Injunction by Peach State Labs, Inc., (Doc. 210, filed May 2, 2011), is **GRANTED** to the extent it seeks a permanent injunction in the following form:

It is hereby **ORDERED** that:

1. EMS and its officers, agents, servants, directors, employees, and all those persons in active concert or participation with such persons who receive actual notice of this Order by personal service or otherwise are hereby enjoined from infringing, inducing the infringement of, and contributorily infringing any one or more claims of U.S. Patent No. 5,672,279 until the expiration of same, including through any of the following actions:

    a. Practicing the method of the '279 patent in the United States using the Infringing Products and all other products that are only colorably different therefrom in the context of the '279 patent, whether individually or in combination with other products or as a part of another product, and from otherwise infringing the '279 patent (35 U.S.C. § 271(a));

    b. Inducing infringement of one or more claims of the '279 patent by inducing the use of any of Infringing Products and all other products that are only colorably different therefrom in a method that infringes the '279 patent (35 U.S.C. § 217(b));

    c. Contributing to infringement of one or more claims of the '279 patent by making, importing, offering to sell, or selling within the United States Infringing Products and all other products that are only colorably different therefrom for use in a method that infringes the '279 patent (35 U.S.C. § 271(c)); and

    d. Manufacturing, selling, or offering to sell urea hydrochloride as a material or apparatus for use in practicing the patented process of the '279 patent.

2. Until expiration of the '279 patent, EMS, its officers, agents, servants, directors, employees, and all those in active concert or participation with them who receive actual notice of this Order by personal service or otherwise are hereby enjoined from further publication or distribution

of any product labels, sales literature, videos, or other instructional or promotional materials that describe or depict how any Infringing Product designed, manufactured, sold, or offered for sale by EMS or their officers, agents, employees, successors, or assigns, or anyone acting on their behalf, may be used to practice any method claimed by the '279 patent, and are further enjoined from communicating in any manner to any potential or actual purchaser or user of any Infringing Product that such product may be used to practice any method claimed by the '279 patent. To ensure compliance with the above provisions of this Order, within thirty (30) days of the date of this Order EMS shall:

    a. Sequester, pending exhaustion of all appeals, all existing product literature, product labels, sales literature, videos, instructional materials, and other documents that instruct users of the Infringing Products in using such products to practice methods claimed by the '279 patent; and

    b. If EMS modifies any Infringing Product to remove the urea hydrochloride component, and if EMS thereafter continues to make, promote, or sell the modified product under the same trade name as the Infringing Product, revise all product labels, product literature, videos, instructional materials, and other documents related to that product to include a conspicuous label stating that the product does not contain urea hydrochloride.

3. EMS is hereby further ordered to provide written notice of this judgment and the injunction ordered herein to: their officers, directors, agents, servants, representatives, attorneys, employees, subsidiaries and affiliates, and those persons in active concert or participation with them, including any and all manufacturers, distributors, retailers, customers, and service providers who have

been involved in making, using, selling, offering for sale, or importing any Infringing Products and to all other persons or entities involved in any way with the making, using, selling, offering for sale, or importing of any Infringing Products. EMS shall take whatever means are necessary or appropriate to ensure that this Order is properly complied with, but at a minimum shall transmit a copy of this judgment and the injunction herein to each of the entities identified in this paragraph.

4. EMS is additionally ordered to recall all Infringing Products, excluding only those products sold before April 19, 2011, and certify the recall of those products through a written report filed with the Court and served on Peach State within thirty (30) days of the date of this Order. Then, pending exhaustion of all appeals, EMS is ordered to destroy the recalled products and certify destruction of those products through a written report filed with the Court and served on Peach State within thirty (30) days of the exhaustion of all appeals.

5. If EMS modifies the Infringing Products to remove the urea hydrochloride component and if EMS thereafter continues to make, promote, or sell the modified products under the same trade names, EMS is required on a quarterly basis to certify in writing and under oath the modifications made, provide true and correct samples of each such product, and provide testing reports from an independent lab verifying the changes made by EMS and certifying that the products do not contain urea hydrochloride. The certification, samples, and test results shall be promptly provided to Peach State's outside counsel for outside counsel's eyes only. EMS shall bear the cost of shipping the samples and of testing.

6. Within thirty (30) days of the date of this Order, EMS is required to file with the Court and serve on Peach State a report in writing and under oath setting forth the manner and form in which

EMS has complied with this injunction, including its instructions to all employees and sales agents regarding this Order.

**DONE** and **ORDERED** in Orlando, Florida on August 12, 2011.

```
                              JOHN ANTOON II
                              United States District Judge
```

Copies furnished to:

Counsel of Record