# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**PEACH STATE LABS, INC.**

                 **Plaintiff,**

-vs-                                **Case No. 6:09-cv-395-Orl-28DAB**

**ENVIRONMENTAL MANUFACTURING
SOLUTIONS, LLC**

                 **Defendant.**

_____/

## ORDER

The instant patent infringement controversy involves the removal of unwanted calcium carbonate. Calcium carbonate is often produced and used in industrial processes but is only slightly soluble in water, causing it to deposit on surfaces and build up in industrial liquids. The disputed patent owned by Peach State Labs, Inc. ("Peach State") relates to a method of using urea hydrochloride to remove unwanted calcium carbonate by converting it to a water soluble salt. A jury found the patent at issue to be infringed by Environmental Manufacturing Solutions, LLC ("EMS").

EMS now moves for judgment as a matter of law, arguing that Peach State failed to meet its burden of proving both indirect infringement and willful infringement. Having considered all of the papers filed by the parties and the evidence presented, the Court denies EMS's motion for judgment as a matter of law.[1]

_____

[1] Currently before the Court is Plaintiff's Motion for Renewed Judgment as a Matter of Law as to Non-Infringement (Doc. 228), and Peach State Labs, Inc.'s [Corrected] Opposition to EMS's Motion Renewed Judgment as a Matter of Law (Doc. 239). Plaintiff's motion was summarily denied in a previous Order (Doc. 276) but therein it was stated that an order addressing the merits of the motions would be entered subsequently. Accordingly, this Order will address the merits of Plaintiff's

## Background

### I. Procedural History

EMS filed the present action against Peach State seeking a declaratory judgment that United States Patent No. 5,672,279 ("the '279 patent") is invalid and not infringed by EMS. (Doc. 1 at 9). Along with its Answer, Peach State filed a Counterclaim alleging that the use of certain EMS products, including—EMS Ready-Mix, BlowOut, Barracuda, Basic CR, SynTech I, SynTech pH, and Eximo—in accordance with the instructions and applications identified in EMS's product literature infringed the '279 patent. (Doc. 29 at 11-12). Peach State additionally alleged that EMS contributed to and/or induced infringement of the '279 patent by others and that EMS's infringement was willful. (*Id.* at 12-13).

The parties disputed the proper construction of several terms of the '279 patent, and a pretrial claim construction hearing was conducted in accordance with *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). (Docs. 41-42). Following the hearing, a Markman Order was entered construing the contested claims. (Doc. 96). The parties then moved for summary judgment on the issues of validity and infringement. The Court granted Peach State's summary judgment motion, finding that EMS failed to create a genuine issue of material fact relating to the invalidity of the '279 patent under 35 U.S.C. §§ 102, 103, or 112, as well as to the affirmative defense of patent misuse. (Doc. 169). On the other hand, EMS's summary judgment motion was granted to the extent it sought a finding that

---

motion, even though the motion has already been denied. Also before the Court is Peach State's Ore Tenus Motion for Judgment as a Matter of Law on Inventorship Claim (Doc. 201). The jury returned a verdict in favor of Peach State regarding inventorship. (Doc. 204 at 2). This Court finds the testimony of Mr. Sargent regarding inventorship credible, and Plaintiff failed to present any evidence to the contrary. Accordingly, Peach State's motion (Doc. 201) shall be granted.

EMS did not contribute to or induce the infringement of the '279 patent by producing and instructing others to use Syntech I.  (*Id.* at 40).  On April 18, 2011, a jury found that EMS willfully infringed claim 1 of the '279 patent and awarded damages to Peach State.  (Doc. 204).  Following an evidentiary hearing held on July 26, 2011, the Court determined that EMS engaged in litigation misconduct sufficient to meet the standard for enhanced damages and attorney's fees.  (Doc. 262).

## II. Patent at Issue

The '279 patent, titled "Method for Using Urea Hydrochloride," issued on September 30, 1997 and is assigned to Peach State.  (Doc. 42-3 at 1).  The invention claimed in the '279 patent relates to a method of solubilizing calcium carbonate, which is often produced and used in industrial processes, but is only slightly soluble in water.  Due to its limited solubility, calcium carbonate tends to deposit on surfaces and build up in industrial liquids, and its accumulation adversely affects industrial processes and equipment.  The '279 patent involves the use of urea hydrochloride to remove such unwanted calcium carbonate.[2]

## III. EMS Products

Peach State alleged that the use of certain EMS products in accordance with the instructions and applications identified in EMS's product literature infringed the '279 patent.  (Doc. 29 at 11).  At trial, the specific EMS products accused of infringing the '279 patent included: (1) EMS Ready-Mix;

---

[2] Claim 1 of the '279 patent—the claim found to be indirectly infringed by EMS—recites:

1. A method to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes adding to the suspensions or dispersions a sufficient amount of urea hydrochloride to convert the calcium carbonate to a water soluble salt, wherein a molar ratio of urea to hydrochloric acid approximately between 1:4 and 4:1 is used to form said urea hydrochloride.

(2) Barracuda; (3) Basic CR; (4) BlowOut; (5) SynTech pH; and (6) Eximo ("Accused Products"). EMS Ready-Mix, Barracuda, and Basic CR are generally used to remove concrete. BlowOut is a line surface cleaner and descaler used to dissolve calcium, lime, scale, milk stone, beer stone, and other deposits. SynTech pH is used to lower the pH of reclaimed water, and Eximo is a soil conditioner designed to be sprayed directly onto turf to solubilize calcium and other salts.[3]

### Standard of Review

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law. Such a motion may be granted against a party "[i]f a party has been fully heard on an issue and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). If for any reason the court does not grant the motion for judgment as a matter of law made at the close of all the evidence, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b).

"The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Summit Tech., Inc. v. Nidek Co.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004). In the Eleventh Circuit, entry of judgment as a matter of law is appropriate "only if 'the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict.'" *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1309 (11th

---

[3] While Syntech I was initially included among the Accused Products, the Court determined on summary judgment that the use of Syntech I did not infringe the '279 patent. (Doc. 169 at 40). Accordingly, the term "Accused Products" in the present Order does not include Syntech I.

Cir. 2007) (quoting *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 n.12 (11th Cir. 2005)). A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000)). For all substantive issues of patent law, district courts apply the law of the Court of Appeals for the Federal Circuit. *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1106 (Fed. Cir. 2003).

### Analysis

### I. Direct Infringement

On April 18, 2011, the jury returned a verdict finding that EMS indirectly infringed the '279 patent by both inducing infringement and contributing to the infringement of claim 1. (Doc. 204 at 1-2). EMS now contends that Peach State failed to present sufficient evidence to support the jury's finding of indirect infringement because the record contains no evidence of direct infringement by EMS or any third party. (Doc. 228 at 6). EMS's argument is without merit.

"When a defendant participates in or encourages infringement but does not directly infringe a patent, the normal recourse under the law is for the court to apply the standards for liability under indirect infringement." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1380 (Fed. Cir. 2007). A finding of indirect infringement requires, as a predicate, a finding that some party directly infringes and thus performs each step of the claimed method. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004). "Absent direct infringement of the patent claims, there can be neither contributory infringement nor inducement of infringement." *Met-Coil Sys. Corp. v. Korners*

*Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986) (internal citations omitted). Further, the Federal Circuit has held that in order to establish the requisite underlying direct infringement, "it is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010) (citations omitted).

In the present case, EMS first contends that Peach State "failed to meet its burden to show direct infringement for each instance of indirect infringement" because Peach State: "(1) did not offer any evidence that anyone, EMS's customer's or otherwise, actually performed the patented method steps; (2) did not offer any documentary evidence that instructed others to practice the patented steps; and (3) did not provide any corresponding testimony tying any documentation to the method or an explanation of how EMS instructed users to perform[] each of claim limitations." (Doc. 228 at 8). This argument is plainly contradicted by the record evidence.

EMS stipulated that it "instructs, directs, and trains customers, distributors, and end users to use the Accused Products according to the directions provided on each Accused Product and/or directions provided by EMS," (Doc. 222 at 114:17-20), and that it's "customers or end-users who acquire the Accused Products from EMS or through distributors of EMS use the Accused Products according to the directions provided on the Accused Products or as directed by EMS," (*id.* at 114:13-16). In addition to EMS's stipulation, the record evidence includes product literature and material safety data sheets for each of the Accused Products. (Def. Ex. 130-35). These documents—created by EMS and reviewed extensively at trial—provide customers and end-users with directions for using

-6-

each of the Accused Products.[4] Taking into consideration these directions, EMS's stipulation that its

customers and end users use the Accused Products as directed by EMS, and the extensive testimony

provided by Peach State's expert witness concluding that the use of the Accused Products in the

manner directed by this product literature infringed the '279 patent, Peach State did not, as suggested

by EMS, fail to offer any evidence of direct infringement.[5] (*See, e.g.*, Doc. 222 at 170) ("[T]he use

of the [Accused Products] as advertised does infringe claim one of the patent."); *PharmaStem*

*Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1351 (Fed. Cir. 2007) ("To be sure, there is no

prohibition against using the admissions of a party, whether in the form of marketing materials or

---

[4] The evidence of record also includes data relating to EMS's actual sale of the Accused Products to customers and distributors. (*See, e.g.*, Def. Ex. 272).

[5] Contrary to EMS argument, the present case is easily distinguishable from *TecSec, Inc. v. International Business Machines, Corp.*, 769 F. Supp. 2d 997 (E.D. Va. 2011). In *TecSec*, the district court determined that TecSec failed to create a genuine issue of material fact as to indirect infringement because TecSec had "produced no evidence of direct infringement by any third party." *Id.* at 1013. During discovery, IBM had asked TecSec to provide "an identification of each person that TecSec contends directly infringed" the asserted patent, and TecSec provided no response. *Id.* at 1013. In addition, each of the customers identified by TecSec as having purchased the allegedly infringing device denied that they used the products in the allegedly infringing manner, and TecSec produced no evidence contrary to these denials. *Id.* Finally, while TecSec argued that the advertising materials for the accused products were sufficient circumstantial evidence that IBM's customers used the products to infringe the patented features, the district court found these materials to be unpersuasive. Specifically, the *TecSec* court determined that "TecSec ha[d] identified nothing in IBM's advertising materials teaching all of the claimed steps or elements *in combination*. In fact, Tecsec ha[d] not cited a single document in which IBM instructs its customers to implement the exact scenario that TecSec contends infringe the [patents at issue]." *Id.*

In the present case, the evidence of direct infringement by a third party includes: (1) EMS's stipulation that its customers and end-users use the Accused Products in the manner directed by EMS; (2) EMS product literature providing customers and end-users with directions for using the Accused Products; and (3) extensive expert testimony that the use of the Accused Products in the specific manner directed by the relevant product literature infringes claim 1 of the '279 patent. Thus, unlike the patentee in *TecSec*, Peach State produced substantial evidence to support a finding of direct infringement by EMS's customers and end users.

otherwise, as evidence in an infringement action; such admissions are entitled to weight along with all other evidence of infringement.").

To the extent EMS contends that direct evidence of infringement by a third party is required to support a finding of indirect infringement, this argument is without merit. It is well-settled that circumstantial evidence alone is sufficient to sustain an infringement verdict. "There is no requirement that direct evidence be introduced, nor is the jury's preference for circumstantial evidence over direct evidence unreasonable *per se*." *Liquid Dynamics Corp. v. Vaughn Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006). "It is hornbook law that direct evidence of a fact is not necessary. "'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1266 (Fed. Cir. 1986) (quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960)); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 13119 (Fed. Cir. 2009) (affirming a jury's finding of direct infringement based on circumstantial evidence); *Alco Standard Corp. v. Tenn. Valley Auth.*, 808 F.2d 1490, 1503 (Fed. Cir. 1986) ("Although the evidence of infringement is circumstantial, that does not make it any less credible or persuasive.").

EMS next argues that Peach State failed to offer any documentary evidence demonstrating that EMS instructed others to practice each of the patented steps in a manner consistent with the Court's claim construction. Specifically, EMS contends that the product literature of record fails to teach the required step of adding a sufficient amount of urea hydrochloride to solubilize calcium carbonate in an aqueous suspension or dispersions of calcium carbonate. (Doc. 228 at 11). In response, Peach State maintains that sufficient evidence was presented to the jury to support a finding that when the

Accused Products are used as described in the product literature, each element of claim 1 of the '279 patent is met. The Court agrees.

As previously discussed, Peach State introduced product literature which provided customers and end-users with directions for using each of the Accused Products.[6] (Def. Ex. 130-35). Next, Dr. Kurtis testified that, in her expert opinion, the use of the Accused Products in the specific manner directed by the product literature infringed claim 1 of the '279 patent. Dr. Kurtis supported this opinion by testifying at length about her ICP/titration analysis of the "run-off" liquid that resulted from the treatment of concrete with Accused Products and her X-ray diffraction analysis. Dr. Kurtis explained how the results of these analyses demonstrated that the urea hydrochloride in the Accused Products was solubilizing aqueous suspensions or dispersions of calcium carbonate. (*See* Doc. 222 at 133:12-135:16, 147:17-154:16; Def. Exs. 229, 233, 235, and 239). Dr. Kurtis also testified about the "Dissolving Properties" tables found in the Accused Products' literature and described how these tables demonstrated that urea hydrochloride—stipulated to be present in the Accused Products—is effective at dissolving calcium carbonate. (Doc. 222 at 154:23-157:22). Finally, Peach State's witnesses repeatedly discussed the portion of EMS's product literature which stated that the Accused Products were "powered by SynTech," known to be urea hydrochloride.[7] (*Id.* at 154:23-157:22).

---

[6] For example, the technical data sheet for the Ready-Mix Truck Wash instructs users to dilute the Ready-Mix Truck Wash in accordance with the users' needs and then "[s]pray or brush on, agitate and rinse. Repeat as needed." (Def. Ex. 130). Similarly, the product literature for Barracuda provides users with dilution information and instructs that users "[a]pply to buildup, agitate, rinse. Repeat as needed. May be left overnight." (Def. Ex. 131).

[7] Contrary to EMS's contentions, Peach State need not have introduced evidence that EMS instructed customers to use the Accused Products with the precise language of the Court's claim construction in order to establish indirect infringement. *See Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1376-77 (Fed. Cir. 2005) (affirming the jury's finding of indirect infringement

In addition to testimony related to the product literature, Peach State also introduced documents and testimony related to ViTech. (Def. Ex. 192). Specifically, Dr. Kurtis testified about ViTech's technical data sheet, which contained dissolution studies similar to those referenced in the Accused Products' literature. Like the "Dissolving Properties" tables, the ViTech dissolution studies demonstrated the superior efficacy of urea hydrochloride over acids such as glycolic acid and phosphoric acid in dissolving calcium carbonate. (*Id.* at 78:16-80:17; Def. Ex. 192 at 13). Finally, Peach State introduced an email chain between John MacDonald, the owner and president of EMS, and Sid Oakley, the executive marketing cell leader for Peach State, confirming that there was no way a phosphoric acid product could outperform EMS's urea hydrochloride products unless it was "spiked" with a dangerous acid. (Doc. 221 at 100:2-102:12; Def. Ex. 188). Thus, considered as a whole, the evidence of record is sufficient to support the jury's finding that the urea hydrochloride in the Accused Products solubilizes aqueous suspensions or dispersions of calcium carbonate in the manner claimed by the '279 patent.[8]

---

where the sales literature did not contain the precise language of the court's claim construction but confirmed, in general terms, that the products should be used in an infringing manner); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1311-12 (Fed. Cir. 1998) (finding an advertisement stating that the accused saws were "designed for sawing joints in green concrete as soon as the slab will support the weight of the saw and the operator," induced infringement because the evidence of record demonstrated that the slab would support this weight when it was within the specific hardness range claimed by the patent at issue, even though the advertisement did not list the precise hardness range identified in the claim).

[8] To the extent EMS contends that Peach State failed to demonstrate that the calcium carbonate dissolved by the Accused Products was present in the required form, this argument is similarly contradicted by the record. Dr. Kurtis testified at length regarding how her testing, including her X-Ray diffraction analyses, confirmed that the use of the Accused Products in the manner directed by EMS solubilized calcium carbonate that was present as either an aqueous suspension or a dispersion. (*See, e.g.*, Doc. 222 at 129:7-133:25, 136:9-142:25, 152:12-154:15).

To the extent EMS argues that Dr. Kurtis's testimony was insufficient to support a finding of infringement because Dr. Kurtis admitted that she did not test whether other components of the Accused Products also solubilize calcium carbonate, this argument fails as a matter of law. As discussed in the Order entered on March 31, 2011, (Doc. 169), it is well established that open-ended transitional phrases such as "includes," "comprising," or "containing," "do[] not exclude additional, unrecited elements or method steps." *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1375-76 (Fed. Cir. 2004); *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 2007) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.").

Here, claim 1 of the '279 patent recites "[a] method to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that *includes* adding to the suspensions or dispersions a sufficient amount of urea hydrochloride to convert the calcium carbonate to a water soluble salt." (Doc. 1 at 15) (emphasis added). Thus, in order to support a finding of direct infringement, Peach State need not have established that urea hydrochloride is the *only* ingredient in the Accused Products that solubilizes calcium carbonate. Rather, as discussed in the March 31, 2011 Order, Peach State "need only establish that the urea hydrochloride in the Accused Products solubilizes calcium carbonate, regardless of the properties of other components of the products that may or may not also solubilize calcium carbonate." (Doc. 169 at 31). Accordingly, even if the jury had concluded that the glycolic acid in the Accused Products was capable of dissolving calcium carbonate, such a conclusion would not preclude a finding that the Accused Products infringed claim 1 of the '279 patent.[9]

---

[9] EMS contends that the facts of the present case are "remarkably similar" to *Cephalon, Inc. v. Watson Pharmaceuticals, Inc.*, 769 F. Supp. 2d 729 (D. Del. 2011). (Doc. 228 at 18). Specifically,

Additionally, while EMS's expert, Dr. Tandy Grubbs, offered his opinion that there was insufficient urea hydrochloride present in the Accused Products to solubilize calcium carbonate, the jury was free to determine the weight and credibility of Dr. Grubb's testimony and to reject his opinion in favor of Dr. Kurtis's competing opinion that there was sufficient urea hydrochloride in the Accused Products to solubilize calcium carbonate in the manner described in claim 1 of the '279 patent. (Doc. 225 at 120:6-16). The jury's conclusion is further supported by the testimony and product literature confirming that urea hydrochloride is substantially more effective at dissolving calicum carbonate than glycolic acid; for example, Dr. Kurtis testified that even though there was five times as much glycolic acid present in the Ready-Mix Truck Wash as urea hydrochloride, the urea hydrochloride would still be dissolving seven times more calcium chloride than the glycolic acid because the glycolic acid was

---

EMS contends that like Dr. Kurtis, Chephalon's expert failed to perform any tests under the precise circumstances of the claims at issue, a failure that was fatal to Cephalon's infringement claim. However, contrary to EMS's assertions, the evidentiary shortcomings of *Cephalon* are not present in the instant case.

   In order to meet each and every limitation of the claim at issue in *Cephalon*, the patentee was required to demonstrate that the potassium carbonate in the accused product was present in "an amount sufficient to increase absorption" upon effervescence. *Id.* at 749. However, Cephalon did not perform *any* absorption testing or experiments comparing the rate and/or extent of absorption. *Id.* In fact, Cephalon was unable to cite any "testimony regarding rates of absorption at all." *Id.* While the district court noted that Cephalon was entitled to rely upon circumstantial evidence to demonstrate that this absorption element was met by the allegedly infringing product, the court concluded that "the record at bar [did] not contain sufficient (i.e., a preponderance of) circumstantial evidence in this regard." *Id.* at 750.

   In the present case, Dr. Kurtis testified about a variety of experiments she conducted which supported her expert opinion that there was a sufficient amount of urea hydrochloride present in the Accused Products to solubilize calcium carbonate in the manner claimed by the '279 patent when the products were used as directed by EMS. Thus, unlike the patentee in *Cephalon*, Peach State did not fail to provide *any* evidence regarding the dissolution of calcium carbonate. Rather, Peach State provided sufficient circumstantial evidence to support a jury finding that each element of claim 1 of the '279 patent was met by the use of the Accused Products as directed by EMS.

thirty-six times less effective than urea hydrochloride at dissolving calcium carbonate. (Doc. 222 at 154:23-157:22). In addition, both Mr. McDonald and Dr. Grubbs stated that the urea hydrochloride in the Accused Products increase the ability of those products to dissolve calcium carbonate. (Doc. 224 at 217:20-218:2; Doc. 223 at 173:1-13).

EMS next argues that Peach State failed to produce sufficient evidence to support the jury verdict of direct infringement because Peach State did not establish that each step of the claimed method is performed by a single party. Specifically, EMS contends that "the only conceivable nefarious actor does not perform" the step of "making [urea hydrochloride] in the appropriate molar ratio." (Doc. 228 at 12-13). However, under well-established Eleventh Circuit precedent, a district court lacks authority to enter judgment under Rule 50(b) on grounds not raised prior to the submission of the case to the jury. *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 902-03 (11th Cir. 2004) ("This Court repeatedly has made clear that any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law under Rule 50(a) at the close of evidence and prior to the case being submitted to the jury."). Here, EMS failed to raise the "single entity" argument as grounds for its initial Rule 50(a) motion for judgment as a matter of law. (*See* Docs. 189, 223 at 104:15-112:3). Nonetheless, even assuming the argument had been timely raised, it is insufficient to support EMS's present Rule 50(b) motion.

"Direct infringement requires a party to perform or use each and every step or element of a claimed method or product." *BMC Res.*, 498 F.3d at 1378-79 (citing *Warner-Jenkinson Co., Inc. v. Hilton Davis Corp.*, 520 U.S. 17 (1997)). For method claims, infringement occurs when a single party performs all of the steps of the claimed process. *Id.* at 1379 (citing *Joy Techs., Inc. v. Flakt, Inc.*, 6

-13-

F.3d 770, 773 (Fed. Cir. 1993)). In the present case, EMS contends that Peach State failed to submit sufficient evidence to support the jury's finding of indirect infringement because no single actor performs the step of "making [urea hydrochloride] in the appropriate molar ratio." (Doc. 228 at 12). However, claim 1 of the '279 patent does not include a step of "making" urea hydrochloride in the appropriate molar ratio.[10]   Instead, the plain language of claim 1 requires only "adding" urea hydrochloride in the appropriate molar ratio. Accordingly, Peach State need not have introduced evidence demonstrating that direct infringers "made" urea hydrochloride in the appropriate molar ratio.

## II. Syntech pH

EMS next contends that Peach State "presented no evidence that SynTech pH infringed the '279 patent." (Doc. 228 at 14). In response, Peach State argues that the SynTech pH's technical data sheets in combination with the testimony of Dr. Kurtis and Mr. MacDonald demonstrate that EMS instructs customers to use SynTech pH in an infringing manner.

EMS stipulated that SynTech pH contains urea hydrochloride in the molar ratio of urea to hydrochloric acid approximately between 1:4 and 4:1. (Doc. 222 at 114:9-12). In addition, Peach State introduced the technical data sheets for SynTech pH, which provide that SynTech pH works "through the power of SynTech ®," described as "15% faster dissolving calcium carbonate than

---

[10] Claim 1 of the '279 patent recites:

1. A method to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes adding to the suspensions or dispersions a sufficient amount of urea hydrochloride to convert the calcium carbonate to a water soluble salt, wherein a molar ratio of urea to hydrochloric acid approximately between 1:4 and 4:1 is used to form said urea hydrochloride.

Muriatic acid while posing no danger to the truck, the person washing it or the environment." (Def. Ex. 134). The technical data sheets further state that SynTech pH "reduce[s] the pH of your reclaimed water," and instruct users that SynTech pH "can be simply added to your water." (*Id.*). Dr. Kurtis testified that, in her expert opinion, if SynTech pH was "used to dissolve calcium carbonate and the calcium carbonate was in one of [] two phases," it would infringe claim 1 of the '279 patent. (Doc. 222 at 256:15-18). Moreover, when asked "[w]hat is the calicum carbonate that SynTech pH dissolves," Mr. MacDonald testified that "it is used in the processed water for your reclaimed water on a Ready-Mix facility like those tanks." (Doc. 225 at 10:22-11:8). Taken together, this evidence is sufficient to support the jury's finding that EMS contributed to the infringement of the '279 patent by instructing others to use SynTech pH.

### III. Contributory Infringement

EMS next argues that Peach State failed to present substantial evidence to support the jury's finding of contributory infringement of the Accused Products because the products were not especially made or adapted for use in a way that infringes the '279 patent, and each of the products have significant non-infringing uses. (Doc. 228 at 14-15). In response, Peach State maintains that the technical data sheets for the Accused Products and the testimony of Dr. Kurtis are sufficient to support a finding of contributory infringement.

"A party is liable for contributory infringement if that party sells, or offers to sell, a material or apparatus for use in practicing a patented process." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 850 (Fed. Cir. 2010). Pursuant to 35 U.S.C. § 271, the "material or apparatus" must be a material part of the invention, have no substantial noninfringing uses, and be known (by the party) to be

especially made or especially adapted for use in an infringement of such patent." 35 U.S.C. § 271(c);

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005).

In the present case, the technical data sheets for the Accused Products and the testimony of Dr. Kurtis are sufficient to support the jury's finding that the Accused Products were especially made for use in infringing claim 1 of the '279 patent. For example, the Ready-Mix Truck Wash data sheet states that Ready-Mix is a "truck wash that removes concrete as effectively as traditional acids," (Def. Ex. 130), and Dr. Kurtis provided her opinion that calcium carbonate is "certainly" present in concrete, (Doc. 222 at 275:3-4), and that the removal of concrete fits within claim 1 of the '279 patent, (*id.* at 235:9-14). Both Basic CR and Barracuda's technical data sheets similarly tout the products' ability to remove concrete and state that the products "out perform other acids when it comes to dissolving calcium carbonate." (Def. Exs. 131-32). BlowOut's technical data sheet states that it is "the most aggressive line cleaner and descaler ever developed," lauding its ability to "dissolve calcium," (Def. Ex. 133), and Dr. Kurtis testified that such use resulted in the dissolution of calcium carbonate in the manner claimed in the '279 patent, (Doc. 222 at 129).[11] The Eximo product literature states that Eximo "makes calcium more soluble," "releas[es] insoluble calicum into the soil solution," and "is powered by SynTech technology." (Def. Ex. 135). The literature also states that "Eximo is designed to be sprayed directly onto turf to solubilize calcium and other salts," and "will reduce calcium carbonate in the soil." (*Id.*). SynTech pH's product literature similarly states that it works "through the power of SynTech," described as "15% faster dissolving calcium than Muriatic acid." (Def. Ex.

---

[11] The technical data sheets for Ready-Mix, Barracuda, Basic-CR, and BlowOut also contain dissolution tables comparing the efficacy of the EMS products in dissolving calcium carbonate to other acids. (Def. Ex. 130-33).

134.) Such evidence is sufficient to support the jury's finding that the Accused Products were especially made for use in infringing claim 1 of the '279 patent.

EMS next argues that it could not have contributed to the infringement of the '279 patent because the Accused Products have significant non-infringing uses. (Doc. 228 at 15). In support of this contention, EMS cites the product literature as a whole and maintains that the literature "provides a listing of substantial non-infringing uses." (Doc. 228 at 15). However, EMS provides no citation to any specific portion of the thirty-four page "composite exhibit" of product literature demonstrating that the Accused Products possess substantial non-infringing uses. In fact, EMS fails to attribute even one specific non-infringing use to a particular Accused Product. Furthermore, even if the jury concluded that the Accused Products may be used in a non-infringing manner in unusual circumstances, such a determination would not preclude a finding of contributory infringement. *See, e.g., Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001) (noting that the Federal Circuit has "held that an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation").

On the other hand, as previously discussed, the product literature contains extensive references to the Accused Products' ability to dissolve calcium carbonate, and the testimony presented from both parties at trial demonstrates the value of using urea hydrochloride to accomplish this task. EMS's own dissolution tables, a part of the product literature, further tout the ability of urea hydrochloride to dissolve calcium carbonate. Thus, viewing the evidence in the light most favorable to Peach State,

a reasonable jury could have concluded that the Accused Products do not have a substantial non-infringing use.

## IV. Willful Infringement

Finally, EMS contends that Peach State failed to present substantial evidence of willful infringement. Specifically, EMS asserts that Peach State did not meet its burden to demonstrate by clear and convincing evidence that EMS acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. (Doc. 228 at 20). In response, Peach State contends that EMS waived the right to challenge the willfulness finding by failing to raise the issue in its Rule 50(a) motion. The Court agrees.

As discussed previously, under Federal Rule of Civil Procedure 50(a)(2), a party moving for judgment as a matter law before the case is submitted to the jury must "specify . . . the law and facts that entitle the movant to the judgment." Rule 50(b) permits the moving party to renew the motion post-judgment. Fed. R. Civ. P. 50(b). The Eleventh Circuit "repeatedly has made clear that any renewal of a motion for judgment as a matter of law under Rule 50(b) must be based upon the same grounds as the original request for judgment as a matter of law made under Rule 50(a) at the close of the evidence and prior to the case being submitted to the jury." *Celebrity Cruises*, 394 F.3d at 903; *Howard v. Walgreen Co.*, 605 F.3d 1239, 1243 (11th Cir. 2010) ("The rule serves to protect a party's Seventh Amendment rights."). As explained in *National Industries, Inc. v. Sharon Steel Corp.*, 781 F.2d 1545 (11th Cir.1986), the purpose of requiring the grounds asserted in a Rule 50(b) motion to align with those asserted in a Rule 50(a) motion

is to avoid making a trap of the motion for judgment notwithstanding the verdict, either at the trial stage or on appeal. When a claimed deficiency in the evidence is called to the attention of the trial judge and of counsel before the jury has commenced deliberations, counsel still may do whatever can be done to mend [the] case. But if the court and counsel learn of such a claim for the first time after verdict, both are ambushed and nothing can be done except by way of a complete new trial. It is contrary to the spirit of our procedures to permit counsel to be sandbagged by such tactics or the trial court to be so put in error.

*Id.* at 1549.

Strict identity of issues raised in the Rule 50(a) and 50(b) motions is not required to avoid waiver in the later filed Rule 50(b) motion. Instead, as long as the issues raised "are 'closely related,' such that opposing counsel and the trial court may be deemed to have notice of the deficiencies asserted by the moving party, the purposes of the rule will be satisfied." *Howard*, 605 F.3d at 1243. However, "if the new and old grounds vary greatly," the court may not rely upon the new grounds to reverse a district court's denial of a Rule 50(b) motion. *Ross*, 146 F.3d at 1289. In that situation, the scope of review is limited to plain error. *See Sims' Crane Serv., Inc. v. Ideal Steel Prods., Inc.*, 800 F.2d 1553, 1557 (11th Cir. 1986) (holding that when no motion for directed verdict is made, a Rule 50(b) motion can be granted only if plain error is shown).

In the present case, EMS's pre-verdict Rule 50(a) motion and related argument did not set forth a challenge to Peach State's willful infringement case. Instead, EMS's pre-verdict motion discussed only indirect infringement, an issue not so closely related to willful infringement so as to provide notice to Peach State of the deficiencies in its willful infringement case because the law, burden of proof, and evidence necessary to establish willful infringement vary greatly from the law, burden of proof, and evidence necessary to establish indirect infringement—including contributory infringement and inducement of infringement.

A finding of willful infringement requires that "a patentee [] show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc). Once the threshold objective standard is satisfied, "the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Id.* On the other hand, as previously discussed, "[a] party is liable for contributory infringement if that party sells, or offers to sell, a material or apparatus for use in practicing a patented process," where the material or apparatus is a "material part of the invention, ha[s] no substantial noninfringing uses, and [is] known (by the party) to be especially made or especially adapted for use in an infringement of such patent." *i4i Ltd. P'ship*, 598 F.3d at 850-51 (quotation omitted). To prove inducement of infringement, the patentee must show direct infringement, and that the alleged infringer "knowingly induced infringement and possessed specific intent to encourage another's infringement." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005). The burden of proof is on the patentee to establish indirect infringement by the preponderance of the evidence. *i4i Ltd. P'ship*, 598 F.3d at 850-53.

Thus, while a finding of direct infringement is a predicate for a finding of willful infringement and indirect infringement, this is the extent of the relatedness between the willful infringement and indirect infringement inquiries. No other inquiry relevant to a finding of willful infringement is similarly relevant to a finding of indirect infringement, and the analyses have differing burdens of proof. Therefore, the Court may not rely on EMS's assertions regarding willful infringement in the

present Rule 50(b) motion to set aside the jury's verdict absent plain error, and EMS has neither argued nor demonstrated that the jury's willful infringement finding constitutes plain error. Rather, EMS simply disagrees with the jury's conclusion that EMS's defense to the allegations of invalidity and infringement of the '279 patent were not "legitimate" or "credible." EMS's disagreement with the weight the jury attributed to EMS's defenses does not constitute plain error. Accordingly, the jury's finding of willful infringement will not be disturbed.

### Conclusion

Based on the foregoing, Plaintiff's Motion for Renewed Judgment as a Matter of Law as to Non-Infringement (Doc. 228) is **DENIED**, and Defendant's Ore Tenus Motion for Judgment as a Matter of Law as to Inventorship is **GRANTED**.

**DONE** and **ORDERED** in Orlando, Florida on December 29, 2011.

JOHN ANTOON II
United States District Judge

Copies furnished to:

Counsel of Record