ENVIRONMENTAL MANUFACTURING
SOLUTIONS, LLC,

        Plaintiff,

v.                               **Case No: 6:09-cv-395-Orl-28DAB**

PEACH STATE LABS, INC.,

        Defendant.

---

## ORDER

A jury returned a verdict finding that Environmental Manufacturing Solutions, LLC (EMS) infringed a patent owned by Peach State Labs, Inc. (Peach State). Based on that verdict, this Court entered a permanent injunction preventing EMS from further infringing the patent. Peach State also alleged that EMS engaged in litigation misconduct, and the Court, after holding an evidentiary hearing, agreed. But the Court withheld imposition of sanctions pending the United States Patent and Trademark Office's (USPTO) reconsideration of the validity of Peach State's patent. More than five years after the jury returned its verdict, the USPTO declared Peach State's patent invalid. The Court then entered judgment reflecting the USPTO's determination of invalidity and vacated Peach State's favorable jury verdict.

Peach State now submits Proposed Findings of Fact Regarding Litigation Misconduct, (Peach State Facts, Doc. 385),[1] and moves the Court to award attorneys' fees

---

[1] Peach State filed both redacted proposed findings of fact (Doc. 383) and an unredacted, sealed version (Doc. 385).

and costs it incurred during the litigation, (Mot. for Fees, Doc. 369). Peach State further requests the Court to impose a monetary contempt sanction against EMS for its misconduct. (Id. at 23–25). EMS filed objections to the proposed findings of fact, (Objs. to Facts, Doc. 392), and a memorandum in opposition to Peach State's request for attorneys' fees and costs, (Resp. to Mot. for Fees, Doc. 386). As set forth below, Peach State's motion is granted in part and denied in part.

## I. Background[2]

On February 27, 2009, EMS sued Peach State in this Court,[3] seeking a declaratory judgment that Patent No. 5,672,279 (the '279 Patent)—owned by Peach State—is invalid and not infringed by EMS. (Compl., Doc. 1, ¶¶ 18–23). Along with its answer, Peach State filed a counterclaim alleging that several of EMS's products infringed the '279 Patent, that EMS contributed to and induced infringement of the '279 Patent by others, and that EMS's infringement was willful. (Am. Answer & Countercl., Doc. 29, ¶¶ 20–24).

### A. The '279 Patent

The '279 Patent is titled "Method for Using Urea Hydrochloride" and describes a method of solubilizing calcium carbonate using urea hydrochloride to remove unwanted calcium carbonate, which is often produced in industrial processes but is only slightly

---

[2] The procedural history and pertinent facts of this case have been well documented in this Court's prior orders. (Order on Mot. Summ. J., Doc. 169; Order on Mot. for Inj., Doc. 276; Order on Mot. for J., Doc. 312; Order on Mot. for New Trial, Doc. 313). For the sake of brevity, this Order addresses only the facts necessary to understand the issues involving EMS's litigation misconduct.

[3] In November 2008, several months before EMS filed the instant action in this court, Peach State filed a lawsuit against EMS in the Northern District of Georgia, alleging patent infringement regarding the same patent at issue in the instant case. After the Georgia case continued through the motion-to-dismiss phase, Peach State voluntarily dismissed the Georgia case. (See Doc. 37 in Case No. 4:08-cv-190-HLM (N.D. Ga.)).

soluble in water.[4] (Ex. A to Compl., Doc. 1 at 12). Calcium carbonate is a major cause of boiler scale in heating systems and raises the pH and solids content of industrial liquids, preventing their disposal in publicly owned treatment facilities. Peach State's patent provided a method using urea hydrochloride for removing that mineral buildup.

## B. The Dispute

Peach State alleged that several of EMS's products (the Accused Products) contained urea hydrochloride and were used in a method claimed in the '279 Patent. (Doc. 29 ¶ 21). Specifically, Peach State contended that EMS, by selling the Accused Products to its customers with instructions on how to use it in a manner that infringes the '279 Patent, induced its customers to infringe the '279 Patent and contributed to the infringement. (Id. ¶¶ 21–22). Peach State sought damages, in part, in the form of a reasonable royalty based on all sales of the Accused Products from June 2008 through trial. (Peach State Trial Br., Doc. 138, at 11).

EMS stipulated that its Accused Products contained urea hydrochloride in the molar concentration set forth in the '279 Patent, (Trial Tr. Vol. II, Doc. 222, at 113), but nonetheless contended that the '279 Patent was invalid and that the Accused Products did not literally infringe the '279 Patent because the active ingredient in the Accused Products that converted unwanted calcium carbonate into water-soluble salt was not urea

---

[4] Claim 1 of the Patent, the only independent claim, provides:

1. A method to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes adding to the suspensions or dispersions a sufficient amount of urea hydrochloride to convert the calcium carbonate to a water soluble salt, wherein a molar ratio of urea to hydrochloric acid approximately between 1:4 and 4:1 is used to form said urea hydrochloride.

(Ex. A to Compl., Doc. 1 at 15).

3

hydrochloride. With regard to the latter contention, EMS argued that its products contained so little urea hydrochloride that urea hydrochloride could not have been the driver behind the Accused Products' ability to convert calcium carbonate into water-soluble salt. (See EMS Mot. Summ. J., Doc. 126, at 21–31; Pretrial Statement, Doc. 143, at 7 ("As a result of the extremely low percentage of [urea hydrochloride] in the Accused Products (between 2% to 10%), EMS denies that Peach State can prove [urea hydrochloride] is actually solubilizing calcium carbonate insofar as the EMS Accused Products are concerned."); id. at 8 ("The most the evidence could possibly show is that the presence of [urea hydrochloride] in these Accused Product formulas tends to enhance the reaction rate.")). On the contrary, EMS contended that the driving force behind its products' ability to solubilize calcium carbonate was glycolic acid or phosphoric acid, both of which were present in much greater amounts in the Accused Products and were exclusively responsible for its products' effectiveness in converting unwanted calcium carbonate into water-soluble salt. (See Doc. 126 at 27 ("Dr. Grubbs provides scientific evidence that the solubilizing that is observed [in the Accused Products] occurs primarily because of the presence of phosphoric acid or glycolic acid." (internal quotation marks omitted)); id. ("[I]f urea hydrochloride were not present in [the Accused Products], they would still work." (footnote and quotation marks omitted))).

The parties further disagreed about whether the '279 Patent was valid; whether the inventors were accurately listed on the '279 Patent; whether EMS induced its customers to use the product in the manner claimed in the '279 Patent; whether EMS contributorily infringed the '279 Patent; whether the infringement was willful; and the amount of damages. (See Doc. 143 at 20).

4

## C. Discovery

During discovery, Peach State sought information from EMS about the Accused Products. In its requests for production, Peach State defined "Accused Products" to include Ready Mix Truck Wash and Wax, Basic CR, Barracuda, BlowOut, Eximo, SynTech pH, and SynTech I. (Peach State Am. Reqs. for Produc., Doc. 71-2, at 3).[5] Peach State's list of Accused Products was based on deposition testimony of John MacDonald, EMS's owner and manager, who testified regarding which EMS products contained urea hydrochloride. (Doc. 385-11 at 4). Peach State served a broad request for production of documents concerning those products. (Doc. 71-2 at 7–10). In those requests, Peach State sought samples and a description of the chemical formulas composing each of the Accused Products. (Id. at 8, 10). After EMS did not produce the requested information, Peach State moved to compel production. (Mot. to Compel, Doc. 71). On October 18, 2010, Magistrate Judge Baker issued an order on Peach State's motion to compel, requiring EMS to produce unredacted formulas and samples of the Accused Products and a summary of its sales data. (Order on Mot. to Compel, Doc. 107, at 8–9).

EMS produced the formulas along with one-gallon samples of each Accused Product as required by the order. (See EMS Sworn Summ., Doc. 385-1 at 2–3). EMS also produced a "sworn summary" of its sales. (Id. at 4–5). Along with the documents, EMS submitted a sworn statement of Mr. MacDonald, who attested that the information was true and correct and was kept in the ordinary course of EMS's business. (Id. at 9).

EMS's formulary data confirmed EMS's position that urea hydrochloride was present in the Accused Products in low amounts—concentrations ranging from 0% to 10%. (Doc.

---

[5] The page numbers for exhibits refer to the page numbers assigned to the PDF document when it was filed in CM/ECF.

385-6 at 2–7; Doc. 385 ¶ 17).[6] Moreover, the formulary data confirmed that many of the products contained 25%–40% of either glycolic or phosphoric acid. (Id.).

### D. Motions for Summary Judgment

After discovery, the parties filed cross motions for summary judgment on all issues—invalidity, infringement, and inventorship. (Docs. 125 & 126). With regard to the issue of infringement, EMS contended in part that Peach State could not establish that urea hydrochloride—as opposed to glycolic or phosphoric acid—was the driving force behind the Accused Products' mechanism of solubilizing calcium carbonate. (Doc. 126 at 21–31). In support, EMS introduced expert opinions that "the phosphoric and glycolic acids in the Accused Products solubilized calcium carbonate—not the urea hydrochloride." (Order on Mot. Summ. J., Doc. 169, at 31; see Doc. 126 at 26–27).

On March 31, 2011, this Court issued an order on the parties' cross motions for summary judgment, denying EMS's motion on the issue of infringement in part because Peach State created a genuine issue of material fact "regarding whether the urea hydrochloride in the Accused Products . . . solubilizes calcium carbonate in accordance with the limitations of the '279 patent."[7] (Doc. 169 at 30). Additionally, the Court granted Peach State's motion on the issue of invalidity but denied it with regard to the question

---

[6] To aid the Court in deciding the instant motions, Peach State submitted a second amended set of proposed findings of fact regarding the litigation misconduct at issue. In response, EMS submitted a four-page objection, which challenges the conclusions that Peach State draws from its factual representations but not the factual representations themselves. (See Doc. 392 at 1–3). Thus, the Court will sometimes cite Peach State's second amended proposed findings where that document provides concise and clear statements of the voluminous facts in this case.

[7] The Court granted EMS's motion to the extent Peach State failed to present evidence creating a genuine issue of material fact regarding infringement as to EMS's SynTech I product. (Doc. 169 at 38–40).

whether Peach State incorrectly listed Richard Sargent as an inventor on the '279 Patent. (Id. at 25–26).

The case then proceeded to a jury trial on the issues of induced infringement, contributory infringement, willfulness, whether Richard Sargent was properly named as co-inventor of the '279 Patent, and damages.

### E.    Jury Trial

After a six-day trial, on April 18, 2011, the jury returned a verdict finding that EMS induced and contributed to infringement of Claim 1 of the '279 Patent, that the infringement was willful, and that Peach State was entitled to a "reasonably royalty" in the amount of $.44 per gallon of infringing product, or $151,392. (Jury Verdict, Doc. 204, at 1–3). The jury further found that EMS did not infringe the other claims of the '279 Patent and that EMS failed to establish that Richard Sargent was improperly named as a co-inventor. (Id.).

### F.    Litigation Misconduct[8]

During trial and after the jury verdict, the parties filed various motions.[9] At a June 3, 2011 hearing on those matters, Peach State raised the issue of litigation misconduct on the part of EMS. (June 3, 2011 Mins., Doc. 245; Post-Trial Mot. Hr'g Tr., Doc. 251, at 48–57). The Court ordered a post-trial discovery period regarding EMS's alleged misconduct. (Doc. 251 at 151–52). On July 26, 2011, the Court held an evidentiary hearing during

---

[8] This section contains a brief summary of the thirty-eight pages of proposed findings of fact contained in Peach State's Second Amended Proposed Findings of Fact (Doc. 385). EMS filed a four-page objection to Peach State's proposed findings of fact, (Doc. 392), but it does not challenge the factual accuracy of Peach State's proposed findings of fact.

[9] Those motions include EMS's Motion for Judgment as a Matter of Law as to Non-Infringement (Doc. 191); Peach State's Motion for Permanent Injunction (Doc. 210); Peach State's Motion for Final Judgment, Award of Enhanced Damages, and Attorney's Fees (Doc. 212); EMS's Renewed Motion for Judgment as a Matter of Law (Doc. 228); and EMS's Motion for a New Trial (Doc. 229).

which Peach State presented evidence of EMS's misconduct. (July 26, 2011 Mins., Doc. 262). Thereafter, counsel for both parties presented oral argument on the issue of litigation misconduct. (Misconduct Hr'g Tr., Doc. 274, at 131–86).

The revelations of EMS's misconduct were manifold. When EMS produced the unredacted formulary data in response to Magistrate Judge Baker's order, it represented that it produced those formulas as they were "ke[pt] in the ordinary course of its business." (Doc. 385-1 at 8). But it is clear that EMS created those formulary documents for litigation and in response to Magistrate Judge Baker's order. (Doc. 385 ¶¶ 28–32). And, consistent with EMS's representation that its products had little or no urea hydrochloride, the formulary data indeed stated that the Accused Products contained little or no urea hydrochloride and a large amount of glycolic or phosphoric acid. (Doc. 385-6 at 2–7). That formulary data matched the chemical composition of the one-gallon samples EMS produced in response to Magistrate Judge Baker's order, but, significantly, they did not match the composition of products Peach State obtained directly from EMS's customers in the marketplace. (Doc. 385 ¶¶ 20–25, 51–54; see Doc. 385-2 at 4–5, 7–8, 26–27). The samples Peach State obtained in the marketplace were shown to contain no glycolic or phosphoric acid and more urea hydrochloride than was represented in EMS's formulary sheet. (Doc. 385 ¶¶ 20–25; see Doc. 385-2 at 4–5, 7–8, 26–27).

During the post-trial discovery period, Peach State analyzed Mr. MacDonald's computer and found a document from May 2010 titled "Product Formulas" that contained formulas for the Accused Products that someone had tried to delete and that was not produced during trial. (Doc. 385 ¶¶ 34, 85; see Doc. 385-9). In that document, none of the Accused Products were listed as having either glycolic or phosphoric acid as

8

ingredients, but some were shown to contain significantly higher levels of urea hydrochloride than originally disclosed. (Doc. 385 ¶ 34; see Doc. 385-9). Additional documents were recovered from a "server computer" at EMS that contained formulary information that was not previously disclosed. (Doc. 385 ¶¶ 46–50). The documents found on the server computer collectively showed that there was no glycolic or phosphoric acid in any of the Accused Products and that urea hydrochloride was found in much higher quantities than represented in the originally produced formulary sheets. (Id.).

Additionally, EMS sought and obtained a patent—Patent No. 7,938,912 ('912 Patent)—that indicated that the Accused Products contained much higher concentrations of urea hydrochloride and no glycolic or phosphoric acid. (Doc. 385 ¶¶ 13–15; Ex. A to EMS Mot. New Trial, Doc. 229-1, at 2–4). EMS applied for the patent on April 7, 2009, and the USPTO awarded it on May 10, 2011—after the jury trial but before the post-trial motions. (Doc. 229-1 at 2). The patent is for a method for removing concrete, cement, and masonry from industrial surfaces, (id. at 2–3), with a solution that has a minimum 14.3% to a maximum 50% concentration of urea hydrochloride. (Williams Decl., Doc. 243-1, ¶¶ 5–12). And, according to the '912 Patent, the solution contains no glycolic or phosphoric acid. (Id. ¶¶ 6–8; see Doc. 229-1 at 2–4). Significantly, EMS represented in its motion for a new trial that the Accused Products "practiced the patented methods" of EMS's new '912 Patent. (Doc. 229 at 25 (stating that because the '912 patent had not yet been awarded at the time of the trial, "Mr. MacDonald could not testify that the Accused Products, when used as instructed, merely practiced the patented methods claimed in the 912 Patent.")). That representation was essentially an admission that the Accused Products contained between 14% and 50% urea hydrochloride, that the Accused Products

9

did not contain glycolic or phosphoric acid, and that urea hydrochloride was the driving force behind the Accused Products' ability to solubilize calcium chloride. (Doc. 243-1 ¶¶ 7–12).

Finally, the sworn summary of sales data provided by EMS in response to Magistrate Judge Baker's order does not match the production logs and invoices that Peach State obtained from EMS's customers, which show that EMS sold high volumes of products that contained concentrated urea hydrochloride that were never disclosed to Peach State as products containing urea hydrochloride. (Doc. 385 ¶¶ 66–81). Specifically, in an earlier deposition, Mr. MacDonald failed to disclose several products that were highly concentrated versions of the Accused Products and EMS did not disclose those products or the sales from those products at any time during the litigation. (Id. ¶¶ 2, 11).

At the conclusion of the hearing on EMS's misconduct, the Court found that "there is clear and convincing evidence of litigation misconduct"; that the misconduct was "egregious"; and that the misconduct, "together with the totality of the circumstances in this case, some of which are unique, is sufficient to meet the standard for enhancement of damages and fees pursuant to 35 [U.S.C. §] . . . 285." (Doc. 274 at 187–88).

### G. Permanent Injunction

On August 12, 2011, the Court entered a permanent injunction against EMS, enjoining it from infringing, inducing infringement of, and contributorily infringing any one or more claims of the '279 Patent until its expiration. (Order on Mot. for Inj., Doc. 276, at 16–19). The Court found that "the injunction is properly applied to both the Accused Products and those products presented during the July 26, 2011 evidentiary hearing in light of the uncontested evidence demonstrating that the[] additional products [containing urea hydrochloride] are no more than colorable variations of the Accused Products that clearly

infringe the '279 patent." (Id. at 14 (footnote omitted)). The Court reasoned that "it is clear that but for EMS's litigation misconduct, the[] additional products [containing urea hydrochloride] would have been disclosed to Peach State and included in the underlying jury trial." (Id.). The injunction required EMS to provide ongoing testing and certifications of the content of its products. (Id. at 18). On September 30, 2014, the '279 Patent expired and the parties agreed that all of EMS's obligations under the permanent injunction also terminated. (Stip. of Expiration, Doc. 348, at 1–2).

## H. Reexamination of Patent with USPTO

On May 9, 2011, a few weeks after the jury returned its verdict, EMS filed a Request for Reexamination of the '279 Patent with the USPTO. (See Doc. 368 at 3). The USPTO accepted the request, and on June 29, 2011, it issued an order indicating that Claims 1 through 5 of the '279 Patent would be reexamined. (Id.). On September 27, 2012, the USPTO found that all claims in the '279 are unpatentable under 35 U.S.C. § 103(a). (Id.). On November 1, 2013, the Patent Trial and Appeal Board (PTAB) affirmed the USPTO's decision, and on February 5, 2014, the U.S. Court of Appeals for the Federal Circuit did the same. (Id.). On March 23, 2015, Peach State filed a Petition for Panel Rehearing or Rehearing En Banc with the Federal Circuit, which was denied. (Id.). On May 25, 2016, the USPTO issued an Ex Parte Reexamination Certificate canceling Claims 1 through 5 of the '279 Patent—the claims upon which this lawsuit was based. (Id.; Doc. 359-1 at 3).

## I. Final Judgment

Meanwhile, on August 12, 2011, the Court had directed the Clerk to enter final judgment for Peach State "in accordance with the portion of the Verdict Form" finding that EMS induced and contributed to infringing the patent. (Doc. 276 at 15). The Court stated that "[a]ll other issues raised in the Motion for Final Judgment . . . will be addressed in a

separate order to be entered at a later date." (Id. at 2 n.2). The Clerk did not enter final judgment at that time. On August 26, 2011, Peach State moved for attorneys' fees, expert fees, expenses, and a monetary sanction. (Doc. 282). On September 29, 2011, the Court ordered that the motion for attorneys' fees was premature and instructed Peach State to renew the motion after final judgment was entered in the case. (See Order on First Mot. for Fees, Doc. 300, at 2 ("No final judgment is reflected in the docket.")). On August 6, 2015, after the Federal Circuit affirmed the USPTO's decision to cancel the '279 Patent, the Court held a status conference and encouraged the parties to attempt to settle the matter. (August 6, 2015 Mins., Doc. 357). The Court ordered that if settlement efforts were unsuccessful, the parties were to submit a proposed form of final judgment and a proposed schedule for pending motions. (Id.).

On July 26, 2016, the parties submitted a proposed form of final judgment, (Doc. 361), which was adopted and issued by the Court on August 5, 2016. (Order & Judgment, Doc. 368). The judgment states:

(1) Based on the USPTO's reexamination, which concluded May 25, 2016, claims 1, 3, and 4 of U.S. Patent No. 5,672,279 are invalid.

(2) Because there can be no infringement of an invalid claim, EMS is not liable for direct infringement, induced infringement or contributory infringement of claims 1, 3, or 4 of U.S. Patent No. 5,672,279.

(3) Because there can be no infringement of an invalid patent and as a result of the USPTO's cancelation of claims 1, 3, and 4, judgment of invalidity of claims 1, 3, and 4 of U.S. Patent No. 5,672,279 and non-infringement of claims 1, 3, and 4 U.S. Patent No. 5,672,279 is hereby entered in favor of EMS.

(4) The Jury Verdict entered on April 18, 2011 (Doc. 204) finding that EMS induced and contributed to infringement of claim 1 of the '279 patent; that infringement was willful; and that Peach State was entitled to damages in the amount of $151,392, or $ 0.44 per gallon of infringing product is hereby set aside and vacated.

(5)   Partial Judgment was previously entered in favor of Plaintiff, Peach State Labs, and against Defendant, EMS, in the form of a Permanent Injunction, which was in place and in force until U.S. Patent No. 5,672,279 patent expired on September 30, 2014. The Permanent Injunction is no longer in place and has no effect.

(6)   The Court retains jurisdiction to award attorney's fees and litigation expenses.

(Id. at 4–5 (footnote omitted)).

### J.   The Renewed Motion for Attorney's Fees, Costs, and Contempt Sanctions

On August 5, 2016, Peach State filed a renewed motion for an award of attorneys' fees, experts' fees, and costs it incurred during the lengthy litigation of this case, and Peach State also sought a monetary contempt sanction against EMS for its litigation misconduct. (Doc. 369). Peach State asserts in its motion that it is the prevailing party in this case and that as such, it is entitled to recover its attorneys' fees in the amount of $1,806,269.14 and costs totaling $233,572.74. (Id.). Peach State also argues that the Court should impose a monetary civil contempt sanction of $200,000.00 against EMS. Id. In its response memorandum, EMS argues that Peach State is not the prevailing party in this case and that EMS should only be liable for the attorneys' fees and costs directly attributable to the litigation misconduct.

## II.   Discussion

### A.   Findings of Fact

This Court has already found based on the evidence adduced at the July 26, 2011 evidentiary hearing that there is clear and convincing evidence that EMS engaged in egregious litigation misconduct. The Court further finds that EMS willfully and intentionally violated the Court's discovery order and that EMS's acts constitute discovery abuse.

Specifically, Peach State established that in response to Magistrate Judge Baker's October 18, 2010 order (Doc. 107) EMS produced false formulary data. The false formulary data contained an incomplete list of products containing urea hydrochloride; it underrepresented the amount of urea hydrochloride in the products; and it listed "active ingredients" that were not actually present in the products. The Court also finds that, to corroborate the false formulary data, EMS produced product samples that it had deliberately altered to match the chemical compositions stated in the false formulary data. Finally, EMS produced false sales data that vastly underrepresented the amount of sales it made of products that contained urea hydrochloride and violated EMS's patent. These acts prolonged litigation, wasted the resources of both Peach State and this Court in addressing frivolous arguments, and prevented the Court from administering justice.

In response to Peach State's proposed findings of fact, EMS filed a four-page objection, stating that it "continues to dispute the evidence submitted at the June 26, 2011 [sic] hearing as well as in [Peach State's] most recent Second Amended Proposed Findings of Fact." (Doc. 392 at 2). In its objections, EMS argues that any undisclosed sales figures "were not disclosed because [Peach State] chose to identify the accused products in this case and it was not EMS's duty to determine which products infringed [Peach State's] patent." (Id.). But EMS fails to recognize that Mr. MacDonald was the one who represented in his deposition the names of all of the products EMS sold that contained urea hydrochloride, yet he failed to include those samples that were highly concentrated, colorable variations of the infringing products. (Doc. 385 ¶ 2). Moreover, EMS did not strictly follow Peach State's characterization of the "Accused Products"—it volunteered sales data on a product that benefitted its position but was not identified by Peach State

14

as an "Accused Product," and it ultimately produced sales data after trial for the concentrated products in response to identical requests for production that EMS previously interpreted to exclude those products. (Id. ¶¶ 56–58).

EMS additionally argues that it "stipulated to the fact that its products contained urea hydrochloride in the molar ratio claimed in the patent such that any arguments regarding the amount of urea hydrochloride are superfluous because the amount was already stipulated to." (Doc. 392 at 2). This argument fails and demonstrates EMS's incorrect use of the term "molar ratio." That term, as it was used in the patent, was defined to mean "a ratio comparing a number of urea molecules to a number of hydrochloric acid molecules." (Order on Claim Construction, Doc. 96, at 18). "Molar ratio" does not have any bearing on the percentage of urea hydrochloride that made up the Accused Products. For example, a product may have 10% urea hydrochloride at a 1:4 molar ratio, and another product may have 20% urea hydrochloride at a 1:4 molar ratio. The percentage of urea hydrochloride in the Accused Products—as opposed to its molar ratio—was a hotly contested issue in the case and was not a stipulated issue. The percentage of urea hydrochloride in the Accused Products was relevant to the issue of damages—which, according to EMS's experts, should be calculated based on the amount of urea hydrochloride in the Accused Products. That percentage was also relevant to the issue of literal infringement—that is, whether the Accused Products' mechanism of converting calcium carbonate into a water-soluble salt was carried out by urea hydrochloride or by some other acid (such as glycolic or phosphoric acid).

The remainder of EMS's arguments—that the samples were not fabricated and that samples obtained from the marketplace should not be trusted—are without support in the record. EMS's objections to Peach State's proposed findings of fact are overruled.

## B.    Attorneys' Fees

In a motion for attorneys' fees and costs, the movant must "specify the judgment and the statute, rule, or other grounds entitling the movant to the award." Fed. R. Civ. P. 54(d)(2)(B)(ii). Peach State argues that it has four bases for entitlement to attorneys' fees: (1) under 35 U.S.C. § 285, based on this case's status as an "exceptional" patent case; (2) pursuant to the Court's inherent authority; (3) pursuant to Federal Rule of Civil Procedure 37(b)(2)(C) based on EMS's failure to comply with the Court's discovery order; and (4) pursuant to Rule 56(h) based on EMS's submission in bad faith of an affidavit in support of a summary judgment motion. Peach State seeks to recover the full amount of its attorneys' fees or, alternatively, to recover fees that are attributable to EMS's misconduct.

### 1.    35 U.S.C. § 285

"The court in exceptional [patent infringement] cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S. Ct. 1749, 1756 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." Id. This Court has already exercised its discretion and determined that this case is exceptional based on EMS's egregious misconduct. (Doc. 274 at 187–88). But since that determination, Peach State's patent has been declared invalid by the

USPTO and the jury verdict finding infringement and awarding damages has been vacated. (Doc. 368 at 4–5). This is important because under 35 U.S.C. § 285, attorneys' fees can only be awarded to a prevailing party. Inland Steel Co. v. LTV Steel Co., 364 F.3d 1318, 1319–20 (Fed. Cir. 2004). The Court must now determine whether Peach State is still the "prevailing party."

"'[P]laintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit.'" Farrar v. Hobby, 506 U.S. 103, 109 (1992) (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)). This occurs when the plaintiff "obtain[s] an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement." Id. at 111 (internal citations omitted). "In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." Id. at 111–12. There can be only one prevailing party, but "[a] party is not required . . . to prevail on all claims in order to qualify." Shum v. Intel Corp., 629 F.3d 1360, 1367–68 (Fed. Cir. 2010).

Peach State contends that it is the prevailing party because the Court issued a permanent injunction in its favor that lasted until it expired about three years later, during which time "EMS was no longer able to compete in the market utilizing a mixture that practiced Peach State's proprietary method." (Doc. 369 at 4). Even if the patent did not expire, Peach State argues, it still would have enjoyed injunctive relief for nearly five years—from the issuance of the permanent injunction on August 12, 2011, until the USPTO issued a Reexamination Certificate canceling the '279 Patent on May 25, 2016. EMS,

however, argues that Peach State is not the prevailing party because Peach State's patent was ultimately declared invalid by the USPTO. The Court agrees with EMS.

The Court is unconvinced by Peach State's argument that it prevailed because it enjoyed years of benefit under the permanent injunction.[10] Although EMS initially failed to carry its summary judgment burden on the issue of invalidity, the USPTO ultimately reexamined Peach State's patent and found that its claims were unpatentable for obviousness under 35 U.S.C. 103(a). (Ex. A to Resp. to Mot. for Fees, Doc. 386-1, at 14 ("[I]t would have been obvious for one of ordinary skill in the art to use [urea hydrochloride] instead of customary [hydrochloric acid] to dissolve the calcium carbonate in aqueous suspension or dispersions, and to arrive at the invention of instant claims 1, 3 and 4." (emphasis omitted))). Thus, the permanent injunction should never have issued. That Peach State enjoyed a few years of benefit from that injunction does not make it the prevailing party. It would be similarly illogical for a plaintiff who obtains a preliminary injunction in its favor but ultimately fails on the merits to cite the preliminary injunction as evidence of its prevailing status. Likewise, it would make no sense for a plaintiff who prevails on the merits but is ultimately reversed on appeal to cite "prevailing in the trial court" as an indication of its prevailing party status. Of course, the plaintiff in neither situation is a prevailing party.

Because the USPTO ultimately cancelled the '279 Patent, the jury verdict in Peach State's favor was vacated and if the patent had not already expired, the permanent injunction would also have been extinguished. Furthermore, a final judgment has been

---

[10] The parties do not dispute that an injunction generally constitutes a benefit qualifying a party for prevailing party status. See Shum, 629 F.3d at 1369–70.

entered in EMS's favor on the issues of infringement and invalidity, and "as a matter of law, a party who has a competitor's patent declared invalid meets the definition of 'prevailing party.'" <u>Manildra Milling Corp. v. Ogilvie Mills, Inc.</u>, 76 F.3d 1178, 1183 (Fed. Cir. 1996); <u>see also</u> <u>Inland Steel</u>, 364 F.3d at 1320 (finding that the USPTO's determination of invalidity on reexamination renders the party who sought invalidation the prevailing party despite the patent holder initially succeeding on the issue of infringement). In light of the final judgment in EMS's favor,[11] Peach State cannot be the "prevailing party" under 35 U.S.C. § 285.

### 2.    Rules 37(b)(2)(C) and 56(h)

Next, Peach State seeks to recover attorneys' fees and costs under Federal Rules of Civil Procedure 37(b)(2)(C) and 56(h), which, respectively, authorize an award of reasonable expenses, including attorneys' fees, incurred by a party for the other party's failure to comply with a discovery order and for submitting in bad faith an affidavit in support of a summary judgment motion. Although EMS clearly violated Magistrate Judge Baker's October 18, 2010 discovery order by producing fraudulent documents and product

---

[11] Although the stipulated judgment issued by this Court stated that "Partial Judgment was previously entered in favor of Plaintiff, Peach State Labs, and against Defendant, EMS, in the form of a Permanent Injunction," (Doc. 368 at 5), no final judgment was ever issued in Peach State's favor, and the permanent injunction did not itself serve as a final judgment. (<u>See</u> Doc. 276 at 2 n.2). Rather, the Court expressly intended to solely "enter final judgment consistent with the jury's factual findings on the issue of infringement of the '279 patent." (<u>Id.</u>; <u>id.</u> at 15 ("The Clerk of the Court is directed to enter final judgment for Peach State Labs, Inc. in accordance with the portion of the Verdict Form labeled Indirect Infringement—Inducing Infringement, . . . , and Indirect Infringement—Contributory Infringement, . . . .") (internal citations omitted)). But, as noted by Magistrate Judge Baker, no judgment was entered at that time. (Doc. 300 at 2). And even if a judgment had been entered, it would have been vacated along with the jury verdict due to the finding of invalidity by the USPTO.

samples,[12] the misconduct in this case was vast and permeated all of the ensuing stages of the litigation. Indeed, the ramifications of EMS's misconduct extended into the parties' retention of expert witnesses, their cross motions for summary judgment, pre-trial preparation, the issues to be litigated at trial, post-trial motions, and extensive discovery into the misconduct. It further caused Peach State to incur expert witness fees and other costs it would not have otherwise incurred. Thus, instead of awarding fees and costs under Rule 37, the Court will do so under its inherent power, which is better suited to providing a full remedy for EMS's misconduct. Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991) ("[A] federal court [is not] forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules. . . . [W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.").

### 3. Inherent Authority

"That federal courts are accorded certain inherent powers is well-established." Sahyers v. Prugh, Holliday & Karatinos, P.L., 560 F.3d 1241, 1244 (11th Cir. 2009). "Those powers are not governed by rule or by statute, 'but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" Id. (quoting Link v. Wabash R.R. Co., 370 U.S. 626 (1962)). "That authority includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial

---

[12] It is less clear that Peach State is entitled to fees under Rule 56(h) for EMS submitting as evidence in support of its motion for summary judgment its expert's report that was based on EMS's fraudulent formulary data and samples. For example, there is no evidence that the expert knew that the data and samples were false.

20

process.'" Goodyear Tire & Rubber Co. v. Haeger, 137 S. Ct. 1178, 1186 (2017) (quoting Chambers, 501 U.S. at 44–45). "[O]ne permissible sanction is an 'assessment of attorney's fees' . . . ." Id. (quoting Chambers, 501 U.S. at 45). Attorneys' fees and costs may be awarded for the "'willful disobedience of a court order,'" Chambers, 501 U.S. at 45–46 (quoting Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240 (1975)), and where a party has "'acted in bad faith, vexatiously, wantonly, or for oppressive reasons,'" id. Under these circumstances, "if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." Id. (internal citations and quotation marks omitted). In light of the Court's finding that EMS engaged in egregious misconduct and violated a court order, the Court will award Peach State attorneys' fees and costs pursuant to its inherent power.[13]

---

[13] EMS cites a First Circuit Court of Appeals case that states that before a court awards fees under its inherent power it must consider "'the proper mix of factors and juxtapose them reasonably.'" (Doc. 386 at 5 (quoting Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1117 (1st Cir. 1989))). EMS contends that the pertinent factors in this case include EMS's ultimate success on validity and the hardships it suffered under the injunction. But the "proper mix of factors" standard does not appear in Eleventh Circuit case law or the Supreme Court's ruling in Chambers. See Purchasing Power, LLC v. Bluestem Brands, Inc., 851 F.3d 1218, 1225 (11th Cir. 2017) ("If a district court is unsure whether to sanction a party under its inherent powers, it should look to the guidance of the Supreme Court in Chambers. The purpose of the inherent power is both to vindicate judicial authority without resorting to contempt of court sanctions and to make the non-violating party whole. The inherent power must be exercised with restraint and discretion. This power is not a remedy for protracted litigation; it is for rectifying disobedience, regardless of whether such disobedience interfered with the conduct of the trial. Courts considering whether to impose sanctions under their inherent power should look for disobedience and be guided by the purpose of vindicating judicial authority." (citing Chambers, 501 U.S. at 45–46)). Thus, this Court will not conduct such an analysis. The Court's findings that EMS engaged in egregious litigation misconduct and willfully violated a court order are sufficient to support an award of fees under the Court's inherent power. Chambers, 501 U.S. at 45–46.

Not surprisingly, the parties dispute the amount that should be awarded: Peach State seeks the full measure of attorneys' fees it incurred throughout the entire litigation—$1,806,269.14—and costs of $233,572.74, while EMS urges that the fees must bear a relation to the misconduct. EMS further argues that Peach State's billing rates and hours expended were excessive.

After the parties filed their memoranda on the issue of fees and costs, the Supreme Court squarely addressed the limitations of courts' inherent powers in awarding attorneys' fees and costs. See Goodyear, 137 S. Ct. at 1186–88 (decided on April 18, 2017). In Goodyear, the Supreme Court concluded that district courts "can shift only those attorney's fees incurred because of the misconduct at issue." Id. at 1186. It reasoned that "[c]ompensation for a wrong, after all, tracks the loss resulting from that wrong." Id. Thus, "a sanction counts as compensatory only if it is 'calibrate[d] to [the] damages caused by' the bad-faith acts on which it is based." Id. at 1186 (quoting Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 834 (1994)). The Court continued:

> A fee award is so calibrated if it covers the legal bills that the litigation abuse occasioned. But if an award extends further than that—to fees that would have been incurred without the misconduct—then it crosses the boundary from compensation to punishment. Hence the need for a court, when using its inherent sanctioning authority (and civil procedures), to establish a causal link—between the litigant's misbehavior and legal fees paid by the opposing party.

Id.

Of course, if a party's misconduct began early in the litigation and the party seeking fees establishes that without such misconduct, it would not have incurred any fees at all, the aggrieved party may recover the full amount of its fees. Id. at 1187–88 (describing that such an award is permissible in cases where "literally everything the defendant did—'his

22

entire course of conduct' throughout, and indeed preceding, the litigation—was 'part of a sordid scheme' to defeat a valid claim" (quoting Chambers, 501 U.S., at 51)). Here, however, Peach State acknowledges that it would have incurred significant portions of its attorneys' fees regardless of EMS's misconduct. (Doc. 369 at 16 ("Should the Court determine that apportionment is appropriate, the fees directly related to EMS's improper and sanctionable conduct are $1,051,967.14.")). Accordingly, Peach State may recover only fees that were incurred due to EMS's misconduct.

### 4. Apportionment of Fees

The Court must now determine which fees Peach State would not have incurred but for EMS's misconduct. Again, Goodyear provides guidance:

> Th[e] but-for causation standard generally demands that a district court assess and allocate specific litigation expenses—yet still allows it to exercise discretion and judgment. The court's fundamental job is to determine whether a given legal fee—say, for taking a deposition or drafting a motion—would or would not have been incurred in the absence of the sanctioned conduct. The award is then the sum total of the fees that, except for the misbehavior, would not have accrued. See [Fox v. Vice, 563 U.S. 826, 837–38 (2011)] (providing illustrative examples). But . . . trial courts undertaking that task "need not, and indeed should not, become green-eyeshade accountants" (or whatever the contemporary equivalent is). Id., at 838, 131 S. Ct. 2205. "The essential goal" in shifting fees is "to do rough justice, not to achieve auditing perfection." Ibid. Accordingly, a district court "may take into account [its] overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." Ibid. The court may decide, for example, that all (or a set percentage) of a particular category of expenses—say, for expert discovery—were incurred solely because of a litigant's bad-faith conduct. And such judgments, in light of the trial court's "superior understanding of the litigation," are entitled to substantial deference on appeal. [Hensley, 461 U.S. at 437].

Id. at 1187.

> [S]imilarly, if a court finds that a lawsuit, absent litigation misconduct, would have settled at a specific time—for example, when a party was legally required to disclose evidence fatal to its position—then the court may grant all fees incurred from that moment on. In each of those scenarios, a court escapes the grind of segregating individual expense items (a deposition

here, a motion there)—or even categories of such items (again, like expert discovery)—but only because all fees in the litigation, or a phase of it, meet the applicable test: They would not have been incurred except for the misconduct.

Id. at 1188.

Applying the "rough justice" principles from Goodyear, the Court must determine which fees were caused by EMS's misconduct. Peach State contends that, absent EMS's litigation misconduct, the case would have settled during a court-ordered mediation that took place on January 31, 2011—after EMS produced the false formulary data, samples, and sales data but several months before the trial began on April 11, 2011. Peach State assumes that if EMS had produced true formulary data and samples in response to Magistrate Judge Baker's order, Peach State's case on the issue of liability for infringement would have been so strong that EMS would have settled at mediation. The Court is unconvinced.

While Peach State's position on infringement would have been strengthened had EMS produced accurate formulary data, it is very unlikely that the case would have settled. Absent EMS's misconduct, only the issue of literal infringement would have been resolved—that is, whether urea hydrochloride and not glycolic or phosphoric acid was the active ingredient in the Accused Products' mechanism of breaking down calcium carbonate. All other issues in the case remained unresolved as of the date of the mediation. Indeed, the Court's order on the parties' cross motions for summary judgment—which resolved some issues—was not issued until March 31, 2011, two months after the mediation. (See Doc. 169 at 40–41). And even after that order was issued, several other issues remained pending. For example, the issues of induced infringement (whether EMS instructed, directed, or advised its customers to use the

24

Accused Products in a manner that infringes each step of the '279 Patent) and contributory infringement (whether there were any non-infringing uses for the Accused Products) remained pending for trial. (See Doc. 138 at 6–7; Order on Mot. for J., Doc. 312, at 5–9, 13–17). And, significantly, the issues of willfulness, damages, and the inventorship of the '279 Patent also remained pending. (Doc. 138 at 11–16).

Moreover, the financial stakes in the case would have been significantly higher absent EMS's misconduct. Had EMS provided a truthful disclosure of its sales data, Peach State's claimed damages would have ranged from $1,000,000 to $1,500,000 as opposed to the $700,000 in damages Peach State sought based on the fraudulent data. (Doc. 385 ¶¶ 91–93; Doc. 138 at 13). EMS's increased exposure would likely have urged Peach State to go to trial. Additionally, this case was vigorously litigated at every stage of the litigation, which has now spanned the better part of eight years. Considering these circumstances, the Court cannot assume that this case would have settled at the January 2011 mediation. The Court concludes that, absent EMS's misconduct, this case would likely have proceeded to trial on all issues except literal infringement.

However, the Court can safely assume that EMS would have incurred fewer expenses during the pre-trial, trial, and post-trial phases of the litigation. If EMS had not provided falsified product formulas, samples, and sales records, less time would have been spent on summary judgment; there would have been no need for extensive of expert testimony on infringement; the trial would have been shorter; and the post-trial motions would have been abbreviated.

Peach State provides estimates of its fees that are attributable to EMS's misconduct and are premised on its contention that the case would have settled:

| Stage of Litigation | Total Fees Peach State Incurred[14] | Fees Peach State Claims are Attributable to EMS's Misconduct[15] |
|---|---|---|
| Investigation and Preparation of Pleadings | $108,140.50 | $0 |
| Discovery | $302,356.50[16] | $0 |
| Claim Construction | $174,497.50 | $0 |
| Expert Discovery | $147,284.50 | $21,733.00 |
| Dispositive Motion Practice | $94,130.00 | $48,174.00 |
| Pre-Trial Preparation | $268,691.50 | $268,691.50 |
| Trial | $259,133.00 | $259,133.00 |
| Post-Trial Motions | $132,162.50 | $132,162.50 |
| Misconduct Matters | $226,684.50 | $226,684.50 |
| Fee Petition | $79,268.00[17] | $79,268.00 |
| Local Counsel Staffing | $16,120.64 | $16,120.64 |

EMS agrees that "the only fees that should be awarded to [Peach State] are the fees that are directly related to the alleged litigation misconduct" but then incorrectly identifies the amount as $226,684.50 for "misconduct matters." (Doc. 386 at 7). But the fees Peach State identifies as "misconduct matters" include only the fees Peach State incurred for "investigating EMS's misconduct, securing samples, conducting chain of custody depositions, testing the samples, and conducting a forensics investigation of EMS's computer records, as well as deposing Mr. MacDonald and presenting the evidence at the hearing." (Doc. 369 at 14–15 (citing Stockwell Decl., Doc. 374, ¶¶ 46–57)). That amount

---

[14] (Stockwell Decl., Doc. 374, ¶¶ 26, 31, 33, 36, 38, 40, 43, 45, 48, 49).

[15] (Second Blackburn Decl., Doc. 376, ¶¶ 9–11, 13, 15, 17, 19, 21, 23, 27).

[16] In its motion, Peach State states that it is seeking $300,156.50 for fees incurred during the discovery phase, (Doc. 369 at 13), but the declaration it cites in support provides that the fees were $302,356.50 (Doc. 374 at ¶ 31; see also First Teilhaber Fees Decl., Doc. 373, ¶ 5(2) (also stating $302,356.50)). The Court assumes the amount stated in the motion is a scrivener's error and that $302,356.50 is the total amount sought.

[17] In its motion, Peach State states that it is seeking $79,268.00 for fees incurred during the fee petition phase, (Doc. 369 at 15), but the declaration it cites in support provides that the fees were $50,239.00, (Doc. 374 ¶ 50). Additional declarations clarify that the fees sought for the fee petition phase are $79,268.00. (Doc. 376 ¶ 25; Second Teilhaber Fees Decl., Doc. 377, ¶ 5(7)).

does not include the fees recoverable under Goodyear—fees that Peach State incurred litigating issues that would have been resolved but for EMS's misconduct. As described above, the Court will award Peach State the full amount of the fees that are attributable to EMS's misconduct, not simply the fees Peach State incurred to investigate and litigate the issue of EMS's misconduct.

Peach State correctly concedes that none of the fees Peach State incurred before EMS disclosed false data and samples are attributable to EMS's misconduct, and those fees thus are not recoverable. This includes fees for investigation and preparation of pleadings, discovery, and claim construction. The Court further agrees with Peach State on the proportion of fees that are attributable to the misconduct for the expert discovery and dispositive motion stages of the litigation. But, with regard to the pre-trial preparation, trial, and post-trial motion stages, the Court estimates that only twenty-five percent of the fees incurred were dedicated to litigating literal infringement, which would have been resolved with true product formulas and samples; thus, only that portion of the fees is recoverable. The Court will accordingly reduce Peach State's claimed fees by seventy-five percent for those three stages of the litigation.

Additionally, Peach State may recover all of its fees reasonably incurred litigating the misconduct matters and for drafting the relevant documents for obtaining an award of attorneys' fees.[18] Finally, Peach State may not recover fees for its locally hired counsel

---

[18] EMS argues that "legal work related to the determination of the amount of attorney's fees is not compensable." (Doc. 386 at 23). However, the authority EMS cites refers to Florida law and does not pertain to the Court's inherent authority to impose sanctions. (Id. (citing Gray v. Novell, Inc., No. 8:06-CV-1950-T-33TGW, 2012 WL 3871872, at *7 (M.D. Fla. Sept. 6, 2012) (stating that under the *Florida civil RICO statute*, expenses related to determining attorneys' fees are not compensable))). Here, it is clear that Peach State would not be entitled to fees absent EMS's misconduct, and it should not

who "assisted with pre-trial preparations" and with whom lead counsel for Peach State consulted "on several critical issues throughout the case to obtain his advice and perspective on local practice and the Court's preferred procedures." (Doc. 374 ¶ 21). Peach State fails to establish any causal link between the work completed by the local counsel and EMS's misconduct.

### 5.   Reasonableness of Fees

Now that the Court has addressed which fees are attributable to EMS's misconduct, the Court must now determine whether the amount of fees claimed is reasonable. In determining a reasonable attorneys' fee, the Court applies the federal lodestar approach, pursuant to which a lodestar is calculated by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate for the services provided by counsel. Loranger v. Stierheim, 10 F.3d 776, 781 (11th Cir. 1994). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 461 U.S. at 437. "Ultimately, the computation of a fee award is necessarily an exercise of judgment, because '[t]here is no precise rule or formula for making these determinations.'" Villano v. City of Boynton Beach, 254 F.3d 1302, 1305 (11th Cir. 2001) (quoting Hensley, 461 U.S. at 436). Additionally, the Court is "an expert on the question [of attorneys' fees] and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." Norman v. Hous. Auth.

---

be penalized for the fees it incurred calculating its fee and drafting documents relevant to recovering its fees. Cf. Thompson v. Pharmacy Corp. of Am., 334 F.3d 1242, 1245 (11th Cir. 2003) (stating that in civil rights cases, attorneys may recover fees for time spent litigating the award of fees).

of the City of Montgomery, 836 F.2d 1292, 1303 (11th Cir. 1988) (quoting Campbell v. Green, 112 F.2d 143, 144 (5th Cir. 1940)).

### a. Reasonableness of the Hourly Rates

"A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." Norman, 836 F.2d at 1299. "The general rule is that the 'relevant market' for purposes of determining the reasonable hourly rate for an attorney's services is 'the place where the case is filed.'" ACLU of Ga. v. Barnes, 168 F.3d 423, 437 (11th Cir. 1999) (quoting Cullens v. Ga. Dep't of Transp., 29 F.3d 1489, 1494 (11th Cir. 1994)). "If a fee applicant desires to recover the non-local rates of an attorney who is not from the place in which the case was filed, he must show a lack of attorneys practicing in that place who are willing and able to handle his claims." Id.

The applicant bears the burden of producing satisfactory evidence that the requested rate is in line with the prevailing market rates, considering both the nature of the suit and the community where it was filed and prosecuted—here, Orlando, Florida. Norman, 836 F.2d at 1299. Satisfactory evidence generally includes evidence of the rates charged by lawyers in similar circumstances, or opinion evidence of reasonable rates. Id.

Counsel for Peach State are employed by the firm of Kilpatrick Townsend & Stockton LLP (Kilpatrick), and worked in Kilpatrick's Atlanta, Georgia office. (Ex. A to Stockwell Decl., Doc. 374 at 21). Peach State seeks to recover its fees at the Atlanta hourly rate—a rate that is roughly 20–30% higher than the Orlando rate. In response, EMS argues that Peach State may not recover non-local rates because Peach State fails to meet its burden of showing that there were no qualified Orlando attorneys available to represent it, citing PODS, Inc. v. Porta Stor Inc., No. 8:04-CV-2101-MAP, 2006 WL 2473627, at *1

(M.D. Fla. Aug. 25, 2006) (declining to award New York rates).  Thus, EMS contends that

the Kilpatrick hourly rates should be discounted to match the prevailing rates in Orlando.

In support, EMS submits an affidavit of Christopher Hill, an Orlando-area attorney, who

evaluated the relative experience of Peach State's attorneys and paralegals and provided

a recommended rate reduction of each person's rate to match Orlando rates.[19]  (Hill Aff.,

Doc. 391, ¶ 21).  The rates of Peach State's attorneys and paralegals are provided in the

table below along with EMS's recommended reduced rate.

---

[19] Peach State seeks to recover fees for eight Kilpatrick attorneys, paralegals, and support staff who worked on this case at various times throughout its history.  Additional Kilpatrick employees worked on the case, but Peach State is not seeking to recover those fees.  (Doc. 374 ¶ 20).

| Attorney and Paralegal Hourly Rates[20] | | | | |
|---|---|---|---|---|
| Timekeeper | Kilpatrick Rates in 2008[21] | Kilpatrick Rates in 2011[22] | Kilpatrick Rates in 2016[23] | EMS Recommended Rates[24] |
| Mitchell Stockwell (Partner) | 510 | 600 | 805 | 425 |
| Jennifer Blackburn (Associate) | 250 | 345 | 560 | 250 |
| Clay Holloway[25] (Associate) | 350 | 425 | -- | 300 |
| Richard Goldstucker (Associate) | -- | -- | 520 | Did Not Provide[26] |
| Kristine Teilhaber (Paralegal) | 220 | 250 | 295[27] | 125 |
| Eden Fesshazion (Paralegal) | 100 | 185 | -- | 115 |
| Arneita Gray (Trial presentation expert)[28] | -- | 100[29] | -- | Did Not Provide |
| Amy Catton (Paralegal & litigation support)[30] | -- | 170[31] | -- | Did Not Provide |

The exception to the general rule identified by EMS—that Peach State must show that no qualified local attorney could have represented it—does not anticipate the convoluted start to this litigation. Before EMS filed the instant case, Peach State filed an identical patent infringement lawsuit against EMS in the Northern District of Georgia on

---

[20] This case was active from 2008–2011 and from 2015–2016. The rates provided in the table show Peach State's rates only for years 2008, 2011, and 2016 to show a representative summary of the hourly rates at the beginning, middle, and end of the litigation. The blank spaces indicate that Peach State is not seeking to recover fees for that time period.

[21] (Ex. A to Scheidler Decl., Doc. 375 at 4).

[22] (Doc. 375 at 4).

[23] (Doc. 376 ¶ 6).

[24] (Doc. 391 ¶ 21).

[25] Mr. Holloway is sometimes referred to as "David C. Holloway" (Doc. 375 at 4), and at other times as "D. Clay Holloway" (Holloway Decl., Doc. 371, at 1). The Court assumes that David C. Holloway and D. Clay Holloway are the same person.

[26] Mr. Hill did not provide a recommended rate for Mr. Goldstucker, Ms. Gray, or Ms. Catton because "[t]here was insufficient information in the materials filed" by Peach State. (Doc. 391 ¶ 24).

[27] (Ex. A to Second Teilhaber Fees Decl., Doc. 377-1, at 64).

[28] (Doc. 374 ¶ 41).

[29] (Ex. A to First Teilhaber Fees Decl., Doc. 373 at 85–86 (providing that Arneita Gray billed $50 for 0.5 hours of work and $200 for 2 hours of work)).

[30] (Doc. 374 ¶ 28).

[31] (Doc. 373 at 78 (providing that Amy Catton billed $68 for 0.4 hours of work)).

November 26, 2008. (See Doc. 1 in Case No. 4:08-cv-190-HLM (N.D. Ga.); George Aff., Doc. 370, ¶ 5 ("The EMS lawsuit began when Peach State filed suit against EMS on November 26, 2008, in the Northern District of Georgia, asserting EMS was infringing Peach State's U.S. Patent No. 5,672,279.")). That suit proceeded through the motion-to-dismiss stage, at which point EMS filed a duplicative lawsuit—this case—three months later on February 27, 2009. (Doc. 1). Kilpatrick represented Peach State in both lawsuits, which advanced concurrently for several months until Peach State voluntarily dismissed the Northern District of Georgia case on July 6, 2009, and proceeded solely in this Court. (See Doc. 37 in Case No. 4:08-cv-190-HLM (N.D. Ga.)). It would have been wasteful and unduly complicated for Peach State to retain two separate law firms to represent it in concurrent litigations that covered the same issues and the same patent.[32]

This case is distinguishable from PODS, 2006 WL 2473627, the primary case cited by EMS. There, a court declined to award non-local New York rates because it was "relatively straightforward and uncomplicated" and the party seeking fees "chose to hire New York counsel *after initially retaining local counsel*" who "filed the complaint and successfully obtained a preliminary injunction." PODS, 2006 WL 2473627, at *2 (emphasis added). Here, however, Peach State reasonably used the same law firm to represent it in the identical Georgia and Florida cases as they proceeded concurrently in 2008 and 2009.

---

[32] Notably, Kilpatrick—and specifically Peach State's lead counsel, Mr. Stockwell—had a familiarity with the '279 patent because it represented Peach State in another lawsuit against a different defendant involving infringement of the '279 patent, Case No. 4:01-cv-338-HLM (N.D. Ga.) (filed on December 31, 2001; (see Doc. 370 ¶¶ 7–8). That case resulted in a consent order dismissing the case with prejudice on December 10, 2002. (See Doc. 16 in Case No. 4:01-cv-338-HLM (N.D. Ga.)).

Accordingly, Peach State is entitled to recover non-local, Atlanta rates for litigating this case.

The Court must now assess whether Kilpatrick's rates are reasonable Atlanta rates. In support of its hourly rate, Peach State provides American Intellectual Property Law Association (AIPLA) survey data for comparison of its attorneys' rates for the years 2008–2011.[33] The AIPLA data provide averages of hourly rates for intellectual property attorneys and categorize them based on years of experience, intellectual property specialization, highest non-law degree, geographic location, and other criteria. (Doc. 374 ¶¶ 12–18; Exs. B & C to Stockwell Decl., Doc. 374 at 33, 44). Upon comparison, each of the attorney rates sought by Peach State for the years 2008–2011 falls within or below the normal range of rates provided in the survey. (Doc. 374 ¶¶ 12–18; see also Scheidler Decl., Doc. 375, ¶¶ 2, 4, 6 (providing similar survey data and comparison)). The Court accepts Peach State's attorneys' rates for 2008–2011 as reasonable, and EMS's arguments to the contrary—including that Peach State misapplied the AIPLA data—are without merit.[34] Gray v.

---

[33] Peach State does not provide survey data for comparison of the attorneys' rates for 2015–2016.

[34] EMS first contends that Peach State erroneously applied the "Metro Southeast" rates (which includes Atlanta), rather than "Other Southeast" rates (which includes Orlando). (Doc. 386 at 12). But Peach State was not trying to demonstrate that its rates were reasonable *Orlando rates*; they were trying to demonstrate that they were reasonable *Atlanta rates*. Accordingly, this argument fails. Second, EMS argues that Peach State incorrectly compared this case to the cases in the AIPLA survey where the amount in controversy was $1 million to $25 million rather than cases where less than $1 million was in controversy. (Id. at 13). EMS is correct that Peach State only sought $700,000 in this case, but it fails to recognize that a substantial part of Peach State's remedy was a permanent injunction and a declaration that its patent was not invalid. Because the AIPLA survey data does not include a section for the value of non-monetary remedies, Peach State was entitled to compare its fees against the $1 million to $25 million survey data. Nonetheless, the Court is not awarding Peach State the full amount of fees sought, so any comparisons to other patent cases have little use and thus will not be considered.

Lockheed Aeronautical Sys. Co., 125 F.3d 1387, 1389 (11th Cir. 1997) (concluding that the district court did not abuse its discretion in relying on survey data in determining a reasonable hourly rate).

Peach State does not provide similar survey data to justify Kilpatrick's 2015–2016 rates, which are significantly higher than its 2008–2011 rates. Thus, Kilpatrick's 2015–2016 rates are unsupported by the record and must be reduced to account for the large disparity from their earlier rates. The Court notes that the hours Kilpatrick billed in 2015–2016 make up roughly forty percent of the total fees Peach State requests for the fee-petition phase of the litigation. (See Ex. A to Second Teilhaber Fees Decl., Doc. 377-1, at 53–65). The Court will impose a ten percent across-the-board reduction to attorneys' fee rates for that stage of the litigation to account for the unsupported rates in 2015–2016.[35]

With regard to the hourly rates of Kilpatrick's paralegals, Peach State cites survey data from the PricewaterHouse Billing Rate and Associate Salary Survey. (See Doc. 375 ¶¶ 5–6; Ex. B to Scheidler Decl., Docs. 375, 375-1, 375-2 (providing survey data of average billing rates for numerous intellectual property litigation firms in 2008–2011)). Kilpatrick's paralegals' rates for all of the years in question fall within the normal billing rates for paralegals with similar experience. (See Docs. 375, 375-1, 375-2). Thus, the Court finds that Kilpatrick's paralegal rates are reasonable.

Other than a ten percent reduction to attorneys' hourly rates in the fee-petition stage of the litigation, the Court will make no reductions to Kilpatrick's hourly rates.

---

[35] If the Court could practicably separate out all of the fees billed by attorneys in 2015 and 2016, it would impose a twenty-five percent reduction to only those fees. But because isolating those fees is not feasible, the Court estimates that a ten percent reduction to the fee petition phase of the case roughly accomplishes the same.

### b.    Reasonableness of Hours Expended

Next, the Court must determine whether the number of hours Peach State's attorneys expended on the litigation was reasonable. Counsel must exercise proper "billing judgment" and exclude hours that are "excessive, redundant, or otherwise unnecessary." Hensley, 461 U.S. at 434. In demonstrating that their hours are reasonable, counsel "should have maintained records to show the time spent on the different claims, and the general subject matter of the time expenditures ought to be set out with sufficient particularity so the district court can assess the time claimed for each activity." Norman, 836 F.2d at 1303. Likewise, a party opposing a fee application should also submit objections and proof that are specific and reasonably precise. Barnes, 168 F.3d at 428. A fee opponent's failure to explain with specificity the particular hours he or she views as "excessive, redundant, or otherwise unnecessary" is generally fatal. Scelta v. Delicatessen Support Servs., Inc., 203 F. Supp. 2d 1328, 1333 (M.D. Fla. 2002). "If fee applicants do not exercise billing judgment, courts are obligated to do it for them, to cut the amount of hours for which payment is sought, pruning out those that are excessive, redundant, or otherwise unnecessary." Barnes, 168 F.3d at 428 (internal quotations omitted). When a court finds the number of hours billed to be unreasonably high, a court has two choices: it may review each entry and deduct the unreasonable time, or it may reduce the number of hours by an across-the-board cut. Bivins v. Wrap It Up, Inc., 548 F.3d 1348, 1350 (11th Cir. 2008).

Due to the uncertainty of success in this case, compounded by the uncertainty that this case would rise to the level of "exceptional" under 35 U.S.C. § 285 or that EMS would engage in misconduct, Peach State was incentivized to minimize fees throughout this case, which tends to show that the number of hours expended in this case was reasonable.

35

Int'l Rectifier Corp. v. Samsung Elecs. Co., 424 F.3d 1235, 1239–40 (Fed. Cir. 2005) ("Whether Samsung had an incentive to minimize costs may be probative of whether Samsung's fee request was reasonable, but such a general finding cannot substitute for specific findings of unreasonable fees."); cf. Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pa., 345 F. App'x 995, 999 (6th Cir. 2009) ("When an insurance company is 'vigorously denying that it [has] any duty to defend,' the insured has 'an incentive to minimize its legal expenses (for it might not be able to shift them).' In such cases, the actually incurred fees are a reasonable measure of the damages caused by the insurer's wrongful refusal to defend." (alteration in original) (quoting Taco Bell Corp. v. Cont'l Cas. Co., 388 F.3d 1069, 1075–76 (7th Cir. 2004))). Moreover, Kilpatrick actually invoiced Peach State for the fees it seeks to recover here, and Peach State paid those fees, (Doc. 370 ¶¶ 10–11), which is a further indication of their reasonableness. Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp., 73 F.3d 150, 153 (7th Cir. 1996) ("Courts award fees at the market rate, and the best evidence of the market value of legal services is what people pay for it. Indeed, this is not 'evidence' about market value; it *is* market value. Although courts interpolate the word 'reasonable' into clauses of this kind, the best guarantee of reasonableness is willingness to pay." (emphasis in original)). Nonetheless, some of EMS's objections to Peach State's fees as being "extravagant, unnecessary, and improper" are well-taken.[36]

---

[36] Several of EMS's arguments are focused on Peach State's fees during the earlier portions of the litigation—pleadings, discovery, claim construction—but fees incurred during those phases are not recoverable by Peach State because they were not caused by EMS's misconduct.

EMS argues that Peach State should not recover any of its paralegal fees because the paralegals spent "a substantial amount of time" on secretarial tasks. (Doc. 386 at 13–16). It is true that fees for work conducted by paralegals is only recoverable if it is work that is traditionally done by an attorney. Scelta, 203 F. Supp. 2d at 1334. EMS identifies a number of secretarial tasks billed by paralegals—i.e., labeling exhibits, contacting a hotel and conferencing regarding transportation of exhibits, contacting travel agents, conferencing regarding an invoice, and downloading and forwarding documents to attorneys. (Doc. 386 at 14). Fees for these kinds of tasks would not be work ordinarily completed by an attorney, and thus it is not compensable. Peach State argues, however, that some tasks cited by EMS—like calendaring dates and preparing binders for hearings—required the legal expertise of someone to review federal and local rules and someone who understands the legal issues involved in the case. Based on a review of the expenses filed with the Court, (Doc. 377-1), the Court will reduce the amount of hours billed by paralegals by thirty percent to account for numerous clerical tasks, many of which are included in "block billing" entries[37] that render it is impossible to tell how much time was dedicated to the secretarial task. See Kearney v. Auto-Owners Ins. Co., 713 F. Supp. 2d 1369, 1378 (M.D. Fla. 2010) (describing that courts may reduce compensable time for block billing—a practice that prevents the court from "evaluating whether or not the attorney or paralegal spent a reasonable amount of time, in the exercise of good 'billing

---

[37] (See Doc. 377-1 at 20 (included among several tasks during a 4.4-hour block was "telephone conferenc[ing] with travel agent regarding trial plans"); id. at 24 (included among several tasks during a 3.8-hour block was "contact[ing] Ms. Farmer regarding credit card to be used at hotel in Orlando"); id. at 32 (included among several tasks during an 11.8-hour block was "plac[ing] exhibit stickers on original court trial exhibits" and "organiz[ing] supplies and other materials for court")).

judgment' on a task" or from "cleanly divid[ing] time . . . where one block of time contains compensable and non-compensable tasks").

EMS also contends that all attorneys' hours should be reduced by fifty percent but provides no reason for doing so other than to account for fees that were not caused by the misconduct. Indeed, many of EMS's objections involve urging the court to award only the hours expended litigating matters that were attributable to the misconduct. As discussed, those objections are well-taken and have been accounted for in the Court's apportionment analysis, above. The remainder of EMS's arguments—overstaffing, excessive meetings, etc.—are without merit. The Court will make no reductions to the number of hours expended in this case other than the thirty percent reduction in paralegal hours.

   *6. Lodestar*

The following tables contain a breakdown of the fees for each stage of the case, applying any reductions described above.

| Expert Discovery | | |
|---|---|---|
| Timekeeper | Amount Requested [38] | Amount Awarded |
| Attorneys | $21,334.00 | $21,334.00[39] |
| Paralegals | $399.00 | $279.30[40] |
| TOTAL | $21,733.00[41] | $21,613.30 |

---

[38] (Doc. 376 ¶ 13).

[39] Because the Court made no adjustments to the hourly rates of attorneys or the amount of hours expended between 2008–2011, fees for attorneys are not reduced.

[40] This amount includes a reduction of thirty percent for the total hours expended by paralegals. This reduction is applied to all stages of the trial for which fees are awarded.

[41] Peach State represents that out of a total of $147,284.50 in fees incurred for working with expert witnesses, (Doc. 373 ¶ 5(4)), only $21,733.00 is attributable to EMS's misconduct. (Doc. 377 ¶ 5(1)).

| Dispositive Motion Practice | | |
|---|---|---|
| Timekeeper | Amount Requested [42] | Amount Awarded |
| Attorneys | $45,943.50 | $45,943.50 |
| Paralegals | $2,230.50 | $1,561.35 |
| TOTAL | $48,174.00[43] | **$47,504.85** |

| Pre-Trial Preparation | | |
|---|---|---|
| Timekeeper | Amount Requested[44] | Amount Awarded |
| Attorneys | $207,306.50 | $207,306.50 |
| Paralegals[45] | $59,715.00 | $41,800.50 |
| Trial Support Expert (Arneita Gray) | $1,670.00 | $1,670.00 |
| Unapportioned Total | $268,691.50 | $250,777.00 |
| Total Attributable to Misconduct (25%) | | **$62,694.25** |

| Trial | | |
|---|---|---|
| Timekeeper | Amount Requested[46] | Amount Awarded |
| Attorneys | $192,447.50 | $192,447.50 |
| Paralegals | $48,135.50 | $33,694.85 |
| Trial Support Expert (Arneita Gray) | $18,550.00 | $18,550.00 |
| Unapportioned Total | $259,133.00 | $244,692.35 |
| Total Attributable to Misconduct (25%) | | **$61,173.09** |

---

[42] (Doc. 376 ¶ 15).

[43] Peach State represents that out of a total of $94,130.00 in fees incurred for dispositive motion practice, (Doc. 373 ¶ 5(5)), only $48,174.00 is attributable to EMS's misconduct. (Doc. 377 ¶ 5(2))

[44] (Doc. 376 ¶ 17).

[45] Amy Catton is considered a paralegal for the purpose of fee reductions. (Doc. 374 ¶ 28).

[46] (Doc. 376 ¶ 19).

| Post-Trial Motions | | |
|---|---|---|
| Timekeeper | Amount Requested[47] | Amount Awarded |
| Attorneys | $122,663.50 | $122,663.50 |
| Paralegals | $9,499.00 | $6,649.30 |
| Unapportioned Total | $132,162.50 | $129,312.80 |
| Total Attributable to Misconduct (25%) | | **$32,328.20** |

| Misconduct Matters | | |
|---|---|---|
| Timekeeper | Amount Requested[48] | Amount Awarded |
| Attorneys | $203,920.50 | $203,920.50 |
| Paralegals | $22,764.00 | $15,934.80 |
| TOTAL | $226,684.50 | **$219,855.30** |

| Fee Petition | | |
|---|---|---|
| Timekeeper | Amount Requested[49] | Amount Awarded |
| Attorneys | $63,194.50 | $56,875.05[50] |
| Paralegals | $16,073.50 | $11,251.45 |
| TOTAL | $79.268.00 | **$68,126.50** |

| Total Fees Attributable to EMS's Misconduct | |
|---|---|
| Pleadings | $0 |
| Discovery | $0 |
| Claim Construction | $0 |
| Expert Discovery | $21,613.30 |
| Dispositive Motion Practice | $47,504.85 |
| Pre-trial Preparation | $62,694.25 |
| Trial | $61,173.09 |
| Post-trial Motions | $32,328.20 |
| Misconduct Matters | $219,855.30 |
| Fee Petition | $68,126.50 |
| **Lodestar** | **$513,295.49** |

---

[47] (Doc. 376 ¶ 21).
[48] (Doc. 376 ¶ 23).
[49] (Doc. 376 ¶ 25).
[50] This amount includes a ten percent reduction in fees, which accounts for attorneys' unsupported rates in 2015 and 2016.

There is a strong presumption that the lodestar figure is reasonable. Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 553–54 (2010). Nevertheless, the Court may adjust the lodestar to account for the "results obtained." Hensley, 461 U.S. at 434. When "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." Id. at 436. Accordingly, the Court has discretion to reduce an award to account for situations where the lodestar figure is unreasonable in light of the limited success obtained. See id. at 436–37. Here, the Court finds no cause to adjust the lodestar due to the parties' relative successes. The lodestar amount—$513,295.49—is reasonable and represents the amount of fees Peach State incurred because of EMS's misconduct.

### C. Litigation Expenses and Costs

Peach State additionally seeks to recover its litigation costs and expenses. The Court will also exercise its inherent powers to award Peach State the litigation expenses and costs it incurred as a result of EMS's litigation misconduct. See Goodyear, 137 S. Ct. at 1186 (stating that courts may award attorneys' fees and costs that are caused by the bad faith conduct of the opposing party). Peach State provides estimates that the following expenses are attributable to EMS's misconduct: chemical testing analysis of the fabricated samples, courier services to ship record exhibits to and from trial, travel and lodging during trial and hearings, legal research, taxable costs under Federal Rule of Civil Procedure 54,[51] and expert witness fees. The Court will address each expense in turn.

---

[51] These costs include: clerk fees for originally filing the case in the Northern District of Georgia; fees for service of summonses and subpoenas; fees for printing or recording

### 1. Chemical Testing

Peach State seeks to recover all of the expenses it incurred in testing the fabricated samples of EMS's products during discovery and re-testing those samples after trial when it was investigating EMS's misconduct. (See Second Teilhaber Fees Decl., Doc. 377, ¶ 13; Ex. D to Second Teilhaber Fees Decl., Doc. 377-4, at 2). The Court finds that Peach State's chemical testing of the fabricated samples during discovery would most likely have occurred regardless of EMS's misconduct. That is, even if EMS initially produced truthful samples, Peach State would still have tested them to ensure they infringed the '279 Patent. Thus, Peach State may only recover $750 for re-testing the products after trial during its investigation of EMS's misconduct. (See Doc. 377-4 at 2).

### 2. Courier Services

Peach State seeks to recover the costs of transporting its trial materials to and from Orlando for trial. (Doc. 377 ¶ 14). Because the Court assumes that a trial would have taken place regardless of EMS's misconduct, the courier services are not recoverable.

### 3. Travel and Lodging

Peach State seeks to recover all of its lodging and travel costs for its attorneys and witnesses. Although the Court assumes that the case would have gone to trial regardless of EMS's misconduct, it is clear that absent the misconduct the issues would have been narrowed. Consistent with the Court's previous estimates regarding the percentage of expenses that would have been saved but for EMS's misconduct, the Court determines

---

transcripts; fees for witnesses; fees for exhibits; and making copies of materials used in the case. (Doc. 373 ¶ 19).

that Peach State may recover twenty-five percent of its total travel and lodging expenses, which amounts to $15,025.04.[52]

### 4. Legal Research

Peach State seeks to recover the costs it incurred in conducting online legal research using subscription-based tools such as Westlaw and LexisNexis. EMS argues that these expenses are unrecoverable as routine office overhead expenses, citing cases that equate recovering costs of conducting online legal research with recovering costs of acquiring and maintaining a law library (and possibly the depreciation of the law books). (Doc. 386 at 24–25 (citing In re Bicoastal Corp., 121 B.R. 653, 656 (Bankr. M.D. Fla. 1990))). The Court disagrees with EMS's reasoning.

There are practical differences between billing for online legal research and billing for the costs of owning and maintaining a physical law library.

> As configured by the provider, computer-aided research is often a variable cost in an individual case—that is, the cost varies (from zero upward) depending on the amount of Westlaw or Lexis service used in the case. By contrast, the firm pays no more or less for its library books, regardless of whether they are pulled off the shelf for a given law suit, so it is described as a fixed rather than a variable cost.
>
> In professional legal services, variable costs that are both large and easily assigned—especially those paid directly to third-party vendors—tend often to be separately billed to the client; those not so easily assigned or inconvenient to track are covered by the hourly fee.

InvesSys, Inc. v. McGraw-Hill Cos., Ltd., 369 F.3d 16, 23 (1st Cir. 2004). Thus, online legal research is a reimbursable expense "so long as the research cost is in fact paid by the firm to a third-party provider and is customarily charged by the firm to its clients as a separate disbursement." Id. at 22. "It is common knowledge that large law firms regularly track

---

[52] This amount is twenty-five percent of $60,100.15—the total amount of travel and lodging expenses claimed by Peach State. (Doc. 377 ¶ 15).

computer-assisted research costs 'by client' (both Westlaw and Lexis make this easy) and then bill clients directly for those costs." Id. at 23 (collecting cases). Indeed, Kilpatrick actually billed Peach State for its online legal research. (Doc. 377 ¶ 17 ("These charges are routinely billed to a client as part of the firm's cost recovery and were billed to Peach State.")). Thus, online legal research expenses are recoverable. Here, the Court estimates that forty percent of Peach State's legal research expenses were incurred as a result of the misconduct, which accounts for research on issues involving literal infringement and the additional research that took place during the misconduct investigation and fee petition stages of litigation. This amounts to an award of $16,808.68 for online research expenses.[53]

### 5. Taxable Costs

Peach State seeks to recover all costs that are taxable under Federal Rule of Civil Procedure 54. Rule 54(d) provides that "costs—other than attorney's fees—should be allowed to the prevailing party." The costs statute, 28 U.S.C. § 1920, enumerates expenses that a federal court may tax as a cost under the authority in Rule 54(d), including: "(1) [f]ees of the clerk and marshal; (2) [f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) [f]ees and disbursements for printing and witnesses; and (4) [f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case."

As addressed at length above, Peach State is not the prevailing party in this case; it is only entitled to those costs incurred as a result of EMS's misconduct. The only Rule

---

[53] This amount is forty percent of $42,021.70, the total amount of online research costs claimed by Peach State. (Doc. 373 ¶ 18). The Court does not accept the estimate provided by Peach State that $29,403.79 of its total research costs—roughly seventy percent—is attributable to EMS's misconduct. (Doc. 377 ¶ 17).

54 expenses that are arguably tied to EMS's misconduct are costs for third-party subpoenas, which "were necessary to prepar[e] the case and investigat[e] . . . the litigation misconduct issue." (Doc. 377 ¶ 18(B)). However, Peach State provides no breakdown of the amount of costs for subpoenas that are attributable to the misconduct and therefore fails to meet its burden. Peach State's taxable expenses under Rule 54(d) are thus not recoverable.

### 6. Expert Witness Fees

Peach State seeks to recover its expert witness fees and states that $68,612.30 of its total expert witness fees—$113,418.49—is attributable to EMS's misconduct. (First Teilhaber Fees Decl., Doc. 373, ¶ 8; Doc. 377 ¶ 19). Expert witness fees may be awarded under the court's inherent powers. Powell v. The Home Depot, U.S.A., Inc., No. 07-80435-CIV, 2010 WL 4116488, at *30 (S.D. Fla. Sept. 14, 2010), report and recommendation adopted, No. 07-80435-CIV, 2010 WL 4102933 (S.D. Fla. Oct. 18, 2010) (citing Amsted Indus. Inc. v. Buckeye Steel Castings Co., 23 F.3d 374, 378–379 (Fed. Cir. 1994)). Peach State's estimate that $68,612.30 in its expert fees were incurred as a result of EMS's misconduct assumes that it would not have presented expert witness testimony on the issue of infringement during trial. (Doc. 369 at 21). But, as described above, several infringement issues remained pending for trial.

Given the high stakes of the case, it is likely that Peach State would have presented at least some expert testimony in support of the pending infringement issues. Thus, the Court estimates that seventy percent of the expert witness fees that Peach State identifies as being attributable to EMS's misconduct are recoverable. This reduction serves to account for the reality that Peach State would most likely not have gone to trial without expert witnesses prepared to testify on the issue of infringement. (Doc. 374 ¶ 34 ("In my

experience, it is standard practice in patent cases to secure expert testimony on such issues as infringement, validity and damages.")).  Thus, Peach State may recover $48,028.61—seventy percent of the expert fees it identifies as being caused by EMS's misconduct.

       7.     *Total Litigation Expenses and Costs Awarded*

| Total Litigation Expenses and Costs Attributable to EMS's Misconduct | |
|---|---|
| Chemical Testing | $750.00 |
| Courier Services | $0 |
| Travel & Lodging | $15,025.04 |
| Legal Research | $16,808.68 |
| Taxable Costs Under Rule 54 | $0 |
| Experts' Fees | $48,028.61 |
| **TOTAL** | **$80,612.33** |

## D.   Civil Contempt Sanction

Peach State seeks to impose a $200,000 monetary "civil contempt sanction" against EMS for engaging in misconduct.  Peach State urges that this Court may award such a sanction under either Federal Rule of Civil Procedure 37 or its inherent powers.

Under Rule 37(b), "a district court may impose sanctions for failure to comply with discovery orders."  Serra Chevrolet, Inc. v. Gen. Motors Corp., 446 F.3d 1137, 1147 (11th Cir. 2006) (quoting Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 695 (1982)).  One of those sanctions includes treating the actions of the disobeying party "as contempt of court."  Fed. R. Civ. P. 37(b)(2)(A)(vii).  In addition to the authority under Rule 37, courts have "'inherent contempt authority' that encompasses the ability to impose civil and criminal contempt."  Serra Chevrolet, 446 F.3d at 1147 (quoting Bagwell, 512 U.S. at 831).

"[A] contempt sanction is considered civil if it 'is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court.'" Bagwell, 512 U.S. at 827–28 (alterations in original) (quoting Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 441 (1911)). "A contempt fine accordingly is considered civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.'" Id. at 829 (quoting United States v. United Mine Workers of Am., 330 U.S. 258, 303–04 (1947)). "Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge . . . ." Id. For example, a "per diem fine imposed for each day a contemnor fails to comply with an affirmative court order" is civil because "once the jural command is obeyed, the future, indefinite, daily fines are purged." Id. On the other hand, "a 'flat, unconditional fine' totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." Id. (quoting Penfield Co. of Cal. v. Sec. & Exch. Comm'n, 330 U.S. 585, 588 (1947)).

Here, the "civil contempt sanction" of $200,000 sought by Peach State does not serve to compensate Peach State. Peach State sought to be compensated with an award of attorneys' fees and costs that it incurred as a result of EMS's misconduct. The Court has granted that compensatory award and now Peach State is made whole for EMS's misconduct. This case is distinguishable from the case relied upon by Peach State, SynQor, Inc. v. Artesyn Techs., Inc., No. 2:07-CV-497-TJW-CE, 2011 WL 2683184 (E.D. Tex. July 11, 2011), wherein the court awarded a $500,000 civil contempt sanction "*to compensate* SynQor for losses sustained due to Delta's discovery violations, including

prejudgment interest." Id. at *7. Clearly, the contempt sanction in that case was compensatory. Here, Peach State offers no explanation of how a $200,000 "civil sanction" would similarly compensate it for losses not otherwise compensated by the award of attorneys' fees and costs. Peach State has been fully compensated for EMS's misconduct, and an additional sanction would not have a compensatory effect. Peach State provides no basis for assessing a punitive, criminal contempt sanction, and thus its motion is denied as to this requested relief.

## III.   Conclusion

Because EMS engaged in egregious litigation misconduct by producing, in response to a court order, false formulary data, false product samples, and false sales data, the Court, under its inherent powers, awards Peach State the attorneys' fees and costs that it incurred as a result of EMS's misconduct. Accordingly, it is **ORDERED**:

1.      Peach State's Renewed Motion and Supporting Brief for Award of Attorneys' and Experts' Fees, Litigation Expenses and Monetary Sanction (Doc. 369) is **GRANTED in part and DENIED in part**. The motion is **GRANTED** insofar as it seeks to recover attorneys' fees and litigation expenses attributable to EMS's litigation misconduct in the amounts of $513,295.49 and $80,612.33, respectively, and is **DENIED** in all other respects.

2.      The clerk is **DIRECTED** to enter a judgment providing that Peach State Labs, Inc. recovers from Environmental Manufacturing Solutions, LLC attorneys' fees and costs in the amount of $593,907.82, for which let execution issue.

**DONE** and **ORDERED** in Orlando, Florida, on August 11, 2017.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record